126 Cal.Rptr.2d 364 (2002)
102 Cal.App.4th 1422
In re GEORGE T., A Person Coming Under the Juvenile Court Law.
The People, Plaintiff and Respondent,
v.
George T., Defendant and Appellant.
No. H023080.
Court of Appeal, Sixth District.
October 23, 2002.
As Modified on Denial of Rehearing November 13, 2002.
Review Granted January 15, 2003.
*367 Michael A. Kresser, Under Appointment by the Sixth District, Appellate Program, Santa Clara, Attorney for Appellant George T.
Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Senior Assistant Attorney General, Stan M. Helfman, Supervising Deputy Attorney General, Violet M. Lee, Deputy Attorney General, Attorneys for Respondent.
MIHARA, J.
An amended petition under Welfare and Institutions Code section 602 alleged that minor George T. ("Julius")[1] made three criminal threats (Pen.Code, § 422) (hereinafter "section 422"). It alleged that Mary S. was the victim in count 1, William Rasmussen was the victim in count 2, and Erin S. was the victim in count 3. After a contested jurisdictional hearing, the juvenile court sustained the allegations involving Mary and Erin but dismissed count 2. At the dispositional hearing, the juvenile court adjudged Julius to be a ward of the court and ordered him committed to the juvenile hall for 100 days. On appeal Julius contends the evidence was insufficient to prove that he made a criminal threat within the meaning of section 422. Alternatively, he contends his case must be remanded because the juvenile court failed to specify whether the offenses were misdemeanors or felonies.

I. Facts
Mary S. was taking an honors English class at the Santa Teresa High School (hereinafter "Santa Teresa") in the Eastside Union High School District in the spring of 2001.[2] When Julius transferred into the school from another school on March 7, he joined Mary's English class. There was one row of desks between Mary and Julius so that they could not talk in class "at all." On Friday, March 16, there was a substitute teacher in the English class. On that date, towards the end of class, Julius moved to a vacant seat closer to Mary, handed her three pieces of paper written in ink, and said, "Read these." The top page said, "These poems describe me and my feelings. Tell me if they describe you and your feelings." As he approached Mary with the papers, he asked her, "Is there a poetry club here?" When Julius handed Mary the papers, he was not laughing or joking. He had a "straight face" and appeared "serious." His face showed no emotion; it was just "blank."
Mary read Julius' paper titled "Faces" in its entirety while in class. The page she read was on lined notebook paper. In the space above the first line Julius had written the words "Dark Poetry." The contents *368 appeared on the page single-spaced as follows:
Faces
 Who are these faces around me?
 Where did they come from?
 They would probably become the
 next doctors or loirs [sic] or something.
 All
 really intelligent and ahead in their
 game. I wish I had a choice on
 what I want to be like they do.
 All so happy and vagrant. Each
 origonal [sic] in their own way. They
 make me want to puke. For I am
 Dark, Destructive, & Dangerous. I
 slap on my face of happiness but
 inside I am evil!! For I can be
 the next kid to bring guns to
 kill students at school. So Parents
 watch your children cuz I'm BACK!!
The note was signed "by: Julius AKA Angel."
After reading the note, Mary became "visibly upset" and just wanted to get out of the classroom. She handed all three pages back to Julius, who just put them away without saying anything. Neither before nor after Julius handed Mary the note did he tell her "anything like" he was "just kidding; I don't really think this[.]"
Mary found the contents of the paper "personally" "threatening" to her "as a student" because Julius described himself as "dark, deceptive, and dangerous" and because he indicated he could "be the next kid to bring guns to kill students at school. So Parents, watch your children cuz I'm back." Mary felt Julius "was threatening [her] life" because his threat to kill students "included me also." Having taken the page entitled "Faces" as a "death threat," she left the school campus "as fast as [she] possibly could" to "get away from [Julius] and whatever thoughts he had in mind." She became "very frightened" and remained so throughout the weekend and the following week. She was afraid to go to school. Based upon her fear, Mary spoke to her parents within 30 minutes after she came home from school on March 16, and her parents seemed "alarmed." Her father tried to call the school but it was closed. On the morning of Saturday, March 17, Mary relayed a summary of the contents of the paper Julius had given her to her regular English teacher through email. The only other person she told about the three papers between March 16 and 17 was her friend Chrissy.
Up until March 16, Mary had had about three conversations with Julius, mainly about "what time it was." She never had spoken with him "about philosophy or anything like that." She never had intimated to Julius that she was "someone who liked to do violence on campus or participate in any kind of violent criminal activity." Julius never had told Mary that he was "really angry or upset at," or that he was "thinking about doing violence" to, a particular student or teacher.
During the weeks before March 16, the English class was reading The Sun Also Rises by Ernest Hemingway. There were no poetry assignments in that class, and Mary was not involved in the school's poetry club. Mary had noticed that the page titled "Faces" had the expression "Dark Poetry" on the top when she read it. Mary understood the term to mean a poem that was entirely about "[a]ngry threats; any thoughts that aren't positive."
On Friday, March 16, Julius also approached Erin S., another student at Santa Teresa. Erin was with Natalie P. at the time. Erin had no "personal relationship" with Julius, but she had spoken with him "three or four times." On this occasion, *369 Julius handed Erin one piece of "folded up" paper and asked her to read it. It was the same page entitled "Faces" that Julius had given Mary. Erin was late for her next class. She opened up the paper and "pretended" to read it to be "polite," but she did not read it. She then put the paper in her jacket pocket. She forgot about it over the weekend.[3]
On the evening of March 17, William Rasmussen, Mary's regular English teacher, returned home and read her e-mail describing the threats Julius had made. Rasmussen called Mary on the telephone. Mary sounded shaky and very concerned, and Rasmussen called police.
On Monday, March 19, police were present at Santa Teresa. When asked about the paper that Julius had given her, Erin pulled it from her pocket and read it for the first time. Reading that page made Erin "very scared." She broke down crying and was "extremely in shock." When Erin first read the note, she believed the words were "a threat to [her] life" and, at the time of the jurisdictional hearing, she still was "scared" by what she had read. She felt her life and the lives of her friends were "in danger" because Julius said that he "can bring guns to school and kill students." She reiterated that she felt the writing was a "definite threat." Erin was not a member of the school poetry club, she had no interest in writing poetry, and she was unfamiliar with the expression "Dark poetry" on the page Julius had given her.
The prosecution presented evidence of a death threat Julius had made against Kathryn H., another Santa Teresa student. At the jurisdictional hearing, Kathryn recanted her prior statements regarding Julius' threat, including statements she had made to her father, friends, and the district attorney examining her on the witness stand. Kathryn admitted she had told her "close" friend Erin that Julius had said he was going to kill her. Kathryn mentioned the threat to Erin after Erin told her she had been to court about this present case and that she had received a threatening "letter" from Julius in which he said he "wanted to kill people at the school." When Kathryn had described Julius's threat to the district attorney, she had said Julius "wasn't smiling" and was "[s]erious." When the prosecutor said Kathryn would have to come to court to testify, Kathryn said she was "scared" to do so, that she was "afraid to face" Julius, and that she had lied about Julius' threat. At the hearing, she testified that Julius never made a threat against her. She also testified that she was scared to come to court, that she had told the prosecutor she was afraid to face Julius, and that they had discussed whether Julius would retaliate if she testified. She said she still was concerned about retaliation from Julius.
William Rasmussen testified he did not teach poetry in the honors English class in which Mary and Julius were enrolled. He had spoken to Julius for about five minutes since Julius had joined the class. The conversation had involved clarification of an assignment. Rasmussen had not had any experience with Julius in which he felt personally threatened nor had the two ever had an argument. Rasmussen described "dark poetry" as "foreboding" and having to do with death and inflicting "major bodily pain and suffering." He read the page entitled "Faces" for the first time on the day he testified. After reading it, he felt "[a]solutely" threatened and "in fear for [his] safety and [his] students' safety." Rasmussen also said reading *370 Mary's e-mail made him "afraid" that one of his students was "going to come to [his] class and [he] could have a bullet whizzing" past his ear. He interpreted the written words in "Faces" "to be an immediate and specific threat to him."
Officer Pach Tran contacted Julius at the house where he was staying with his uncle. When Tran asked whether there were guns in the house, Julius nodded affirmatively. Patrick Williams testified that his nephew Julius and Julius' father were staying at his home in March 2001. At that time, Williams had a .30-.30 "hunting rifle," a Smith and Wesson ".38 special" revolver, and ammunition for both guns, in the house; he was surprised to learn that Julius knew about the guns.
Tran testified that Julius took a piece of paper with writing on it from his pocket and gave it to Tran. On the upper right comer of the unlined paper were the words "dark poetry." The unsigned page, which was in single-spaced printing, read as follows:
Faces in My Head
 Look at all these faces around me.
 They look so vagrant.
 They have their whole lives ahead of
 them.
 They have their own indivisaulity
 [sic].
 Those kind of people make me wanna
 puke.
 For I am a slave to very evil masters.
 I have no future that I choose for myself.
 I feel as if I am going to go crazy.
 Probably I would be the next high
 school killer.
 A little song keeps playing in my
 head.
 My Daddy is worth a dollar not even 100
 cents.
 As I look at these faces around me
 I wonder why r they so happy.
 What do they have that I don't.
 Am I the only one with the messed up
 mind.
 Then I realized, I'm cursed!!"[4]
Natalie P. testified on behalf of Julius as follows. Natalie got to know Julius by meeting him after school for an hour to an hour and a half. On March 16, Julius gave her a poem to read after school. Natalie took it home. The two previously had discussed the fact that Julius wrote poetry. When Natalie cleaned her room, she shredded several papers. She tore up Julius' paper and threw it away on the same day he gave it to her. Natalie said she did not believe Julius was a violent person; she thought he was "mild and calm and very serene." Rather than viewing Julius' writing as a threat, Natalie said it made her feel "sad." At trial, a portion of the piece of paper Julius gave Natalie was presented to the court. The legible portion of that writing read as follows:
 t Soul
 oem
 Who Am I
 ... ns I created?
 ... cause i really
 ... feel as if
 ... in stolen from
 ... of peace.
 ... Taken to a
 place that you hate. You r
 locked up and when you r
 let out of your cage it is to
 perform. Not able to
 be yourself and always
*371
 hiding & thinking would people
 like me if I behaved differently?
 by Julius AKA Angel
In his testimony, Julius acknowledged he wrote all of the pages quoted above. He conceded his words in the page entitled "Faces" would be "scary" and "frightening" and would "obviously threaten" a fellow student if the recipient did not know him and did not know he was "just kidding."
Julius said he wrote "Faces" on March 16, during the 6th period English class he had with Mary S., because he "was having a bad day." He could not find something he was looking for in his backpack and he then went without lunch because his parents forgot to give him money. Julius said this was his first "poem" having to do with killing, that, usually, his poems were about lost angels or an imaginary character. That day, the only way he could get his thoughts out was by writing them down. He put in the reference to killing because he and his friends joke about the Columbine killings, saying, "Oh, I'm going to be the next Columbine kid; I'm going to shoot everybody at the school." His reference to Columbine in his poem was "just a joke." He did not intend "Faces" to "be a threat to anyone."
Julius testified he wrote the "poem" "Who Am I" during lunch on March 16 and wrote "Faces in My Head" on March 18 because he was trying to recollect what he had written in "Faces" so he could put it in his poem file. He testified he did not give Mary S. "Faces" or any writing but acknowledged that Mary's e-mail to Rasmussen referenced language in "Faces."
Julius said he took "Faces" outside with him after class on March 16 and was about to put it in his backpack when Erin and Natalie asked about it. Erin asked Julius for a poem, saying she collects them. Julius had "Faces" and "Who Am I" in his hands; Erin picked "Faces" and Natalie picked "Who Am I." He said Erin was not truthful when she testified that he handed her the paper and she ran off to class without reading it.
Julius said he did not intend either his "Faces" or "Who Am I" poems to be a threat. He knew Erin and Natalie collected poems and that they wanted his poems for their files. He acknowledged the language in his poems would be frightening and threatening if Erin and Natalie did not know him and realize he was not serious, but he thought they would see the poems as a joke. He also believed both wrote dark poetry so they would not be scared by his poems. He wrote the words "Dark poetry" at the top of his poem because he wanted the reader to know this was "dark poetry." He testified that he believed "dark poetry" did not suggest that the writer was going to do what he wrote.
Julius said he did not know either Mary or Kathryn, and he denied making any threat to Kathryn. Asked why Kathryn would be afraid of retaliation, he said it was because "she knows she lied" and because, even if she had told the truth when she reported that Julius had threatened her, she probably was "scared of saying it in front of a young black male." Julius also believed Officer Tran lied on the witness stand, possibly because he had been "bribed" by the school district.
Julius believed the school district had "been out to get [him]" for at least two years. He had been in three different schools in the last couple of months, having been asked to leave other schools. In one school, he was caught plagiarizing from the Internet, but he felt they were "discriminating against" him because he had only two weeks to do the assignment while others had had three months. He got in trouble at one school for urinating on the *372 wall, but he explained that he had had a bladder problem at the time. Julius also felt the school district was out to get him because he was "kicked out" of one high school because he did not live in the district anymore and because an English teacher gave him a lower grade than he deserved. Julius added that he and his mother had caught "one of the directors" at Oak Grove High School in a lie.

II. Discussion

A. Sufficiency of the Evidence to Support Section 422 Findings
To prove a violation of section 422, the prosecution must establish "(1) that the defendant `willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat `with the specific intent that the statement ... is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threatwhich may be `made verbally, in writing, or by means of an electronic communication device'was `on its face and under the circumstances in which it [was] made, ... so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened `to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was `reasonable]' under the circumstances. [Citation.]" (People v. Toledo (2001) 26 Cal.4th 221, 227-228, 109 Cal. Rptr.2d 315, 26 P.3d 1051.) Referring to the element subdivisions set forth in the Toledo opinion, Julius contends that, "[i]n the present case, sufficient evidence of elements (1), (3), and (5) are lacking."

1. The Juvenile Court's Findings
Before turning to Julius' specific claims, we set forth the juvenile court's remarks supporting its finding that Julius had made criminal threats to Mary and Erin. The juvenile court prefaced its findings with the following remark, "All right. I've given this case a lot of thought as I've been hearing the evidence. I didn't really have a conclusion until after I heard Julius speak." The juvenile court explained that, "with respect to the evidence, I think a very telling response of the minor was that anybodyincluding his own motherif she saw this poetry of his, would deem it to be a threat. She would be concerned about it. It would be something that would really, really affect her. So I think the language in and of itself is extremely frightening, very threatening, and certainly falls within the categories of the statute. ... [¶] And I've looked at the testimony of the witnesses and observed them. I observed the minor and his' testimony. I've heard his testimony. And I'm convinced in my mind that there's only one rational conclusion, and that is that when he gave those poems to those two girls, that those poems were intended to be a threat. And I'll tell you why. You see, first of all we have his testimony that he was not upset, but he was depressed because he had a bad day. Okay. We know he's had a lot of bad days in school going back to his being rejected from two schools and now he's in the third school. [¶] The other thing is, is it's really critical when you look at the circumstances, the surrounding circumstantial evidence. Look, if he'd been in the poetry class and there has been discussions about dark poetry involving killing, shootings, destroying lives, that would have been a different situation. That would have been circumstances against it beingthat would be innocent intent. But there's nothing to establish that at all. [¶] Secondly, the girls, they themselves the two girls, Erin and Marythey both had totally out of the *373 clear blue sky, they get this shocking document or documents; just shocks them. It was so shocking to them that Mary decided to write the e-mail to the English teacher and let him know that was really something. In fact, she was so scared she didn't even want to give her name, but because of the e-mail, her name was automatically disclosed. The other girl, when she read it, it really petrified her. There was nothing to establish that there was a relationship. There was nothing to establish that he was not serious. There was nothing to establish that it was an innocentjust a poetry exercise. [¶] I think it's reasonable to conclude that if somebody gave me that poem, except that they had ["]the courthouse["] or this department, I would not conceive of it to be a joke. Furthermore, anybody that did it and didn't have something to surround it, to explain to me that it was, in fact, a joke, my feeling of the evidence and the interpretation is that person intended for me to be afraid, to be a threat."

2. Standard of Review
In considering Julius' insufficiency claims, we review the entire record in the light most favorable to the prosecution and presume in support of the jurisdictional order the existence of every fact the trier reasonably could have deduced from the evidence to determine whether there is substantial evidence to support each of the essential elements. (People v. Johnson (1980) 26 Cal.3d 557, 576-578, 162 Cal. Rptr. 431, 606 P.2d 738.)

3. Evidence of a Threat to Commit a Crime
Julius first contends the evidence was insufficient to support the juvenile court's findings that the words in his paper entitled "Faces" constitute a threat as opposed to "clearly the imaginative exploration of the inner feelings of a young person." He argues that his writing was simply a "prose poem" in which "a fictional character says he is capable of committing criminal acts" rather than "a direct statement of personal intent."
In considering whether there was substantial evidence presented to support the juvenile court's finding that the writing "Faces" constitutes a threat by Julius with the specific intent that his words were to be taken as a threat, we consider "all the surrounding circumstances and not just on the words alone. The parties' history can also be considered as one of the relevant circumstances. [Citations.]" (People v. Mendoza (1997) 59 Cal.App.4th 1333, 1340, 69 Cal.Rptr.2d 728.) Here, as in Mendoza, the trier of fact "was free to interpret the words ... from all of the surrounding circumstances of the case." (Id. at p. 1341, 69 Cal.Rptr.2d 728.) The circumstances surrounding the threat include the "mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the [minor]." (People v. Solis (2001) 90 Cal.App.4th 1002, 1013, 109 Cal.Rptr.2d 464.) "Section 422 requires only that the words used be of an immediately threatening nature and convey `an immediate prospect of execution' ... even though the threatener may have no intent actually to engage in the threatened conduct. The threat is sufficient if it induces a `sustained fear.'... [The statute] does not require the showing of an immediate ability to carry out the stated threat." (In re David L. (1991) 234 Cal.App.3d 1655, 1660.) Section 422 does not require details such as a time or precise manner of execution to be expressed. (Ibid.)
Here, Julius testified that he wrote the page titled "Faces," and he acknowledged that his words, on their face, were frightening and threatening. Julius' statements that he was "Dark, Destructive, & Dangerous," that he can "slap on [his] face of happiness but inside [he is] evil," and that he "can be the next kid to bring guns to *374 kill students at school," along with his warning that parents should "watch [their] children cuz [he']s BACK" conveyed a threat "to commit a crime which will result in death or great bodily injury to another person." (Section 422.) The statements were not made in the context of a poetry course or a poetry assignment, and the students had not been asked to show each other their writings. Even Julius' English teacher, who was familiar with the concept of "dark poetry" and "dark literature," testified that he felt personally threatened after reading the words Julius had handed to two students at Santa Teresa.
The history of the parties involved and the context in which the threats were made provide strong circumstantial evidence that Julius intended his words to be taken as a threat. Here, Julius was new to Santa Teresa and only had been in Rasmussen's class for eight days when he handed "Faces" to Mary. She had had no previous interaction with Julius except to ask what time it was. Julius admitted he "hardly even kn[e]w her." As noted above, the class was not studying poetry. Julius approached Mary in class with a serious blank face and handed her "Faces" to read. Significantly, along with that page, he wrote a note indicating that his words in "Faces" expressed "me and my feelings." (Italics added.) When she read "Faces," Mary became visibly upset. She handed it and the other paper back to Julius, who put them in his backpack without saying anything.
Later that day, Julius approached Erin and handed his "Faces" writing to her. Erin had no relationship with Julius; he was just a student at her school. She pretended to read the paper to be polite before rushing to her next class. When she later read it, she became very scared and broke down in tears. Erin was not a member of the school poetry club, had no interest in writing poetry, and never had written "dark poetry."
The fact that there was no ongoing relationship between Julius and either Mary or Erin and that the two girls were not studying poetry or involved in the school poetry club and that Julius handed over the "Faces" writing without any accompanying indication that he was joking or that its words should not be taken seriously provided evidence that Julius intended his writing as a threat to be taken seriously.
Additional circumstances support the conclusion that the writing "Faces" constituted a threat and that Julius intended it to be taken as a threat. Julius had been in three schools in the past couple of months, having been asked to leave his previous schools because of behavioral problems. He believed the school district "has always been out to get [him]," at least for the past two years, and that it may have gone so far as to bribe the investigating officer in this case. Julius also believed the principal at one school had colluded with a teacher who gave him an undeservedly low grade. Julius' long-held views of the school district and the schools he had attended in that district and his list of incidents in which he felt he had been wronged or discriminated against by schools in the district are part of the surrounding circumstances which support a finding that the words in "Faces" were intended as a threat to get back at the school district and its schools. The evidence of Julius' relationship to the school district, along with the manner in which he presented his writing to Mary and Erin, support the finding that Julius' presentation of his "Faces" writing to both girls was intended to terrorize innocent students, including Mary and Erin, even if he had no intention of carrying out the threats.
*375 In addition, the juvenile court was entitled to consider as part of the circumstances surrounding Julius' handing "Faces" to Mary and Erin the evidence that Julius had threatened to kill another female student at the same school since her testimony strongly suggested that she recanted her statements because she feared retaliation from Julius. The fact that Kathryn had told her father and the district attorney handling Julius' case that Julius made a death threat against her provided additional circumstantial evidence that the writing constituted a threat and that Julius intended his words to be taken as a threat.
The fact that Julius apparently had surreptitiously discovered there were two firearms and ammunition in his uncle's home where he was staying during the month in question provide further evidence that Julius intended his words to be taken as a threat.
Finally, the juvenile court could take into account the fact that Julius referred to killing in his writing because he and his friends "kind of joke[d]" about the Columbine killings, saying, "Oh, I'm going to be the next Columbine kid; I'm going to shoot everybody at the school." The fact that the writing in question mentioned the student killings at Columbine and was directly delivered to students within a school context constitutes an additional circumstance surrounding its delivery supporting the conclusion that the writing "Faces" constituted a threat and that Julius intended it to be taken as a threat.
We are not persuaded by Julius' claim that "Faces" was written from the viewpoint of "a fictional character in a poem" since Julius handed it to Mary with a sheet of paper on top that said, in part, "These poems describe me and my feelings." Instead, we are convinced that the circumstances surrounding the delivery of the page entitled "Faces" to Mary and to Erin demonstrate that Julius made a threat to each girl with the specific intent that the statements were to be taken as a personal threat.
We similarly are not persuaded by Julius' claim that he had a First Amendment right to communicate with his fellow students by choosing, "somewhat unwisely in retrospect, to share his feelings of teenage angst with two other students by giving them a `Dark Poem,' in which he expressed negative emotions." In support of this claim, Julius cites Tinker v. Des Moines Independent Community School District (1969) 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, which held that it was a violation of the First Amendment rights of students at public high schools to deny those students the right to wear black arm bands in protest of the Vietnam War. In particular, he relies upon the portion of the opinion that held the constitutional rights of public school students are "not confined to the supervised and ordained discussion which takes place in the classroom.... Among [school] activities is personal inter-communication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the educational process." (Id. at p. 512, 89 S.Ct. 733, fn. omitted.) However, Julius fails to mention that the Tinker court recognized that regulation of speech of conduct of students would not violate their constitutional rights to free speech if it could be shown that such words or conduct "would materially and substantially disrupt the work ... of the school. [Citation.]" (Id. at p. 513, 89 S.Ct. 733.) We are convinced that Julius' written communication, which reasonably conveyed to fellow students, both on its face and under the surrounding circumstances, that their lives and the lives of fellow students were in danger was a constitutionally unprotected *376 communication which reasonably could lead to "substantial disruption of or material inference with school activities." (Id. at p. 514, 89 S.Ct. 733.)
The recent decision in In re Ryan D. (2002) 100 Cal.App.4th 854, 123 Cal. Rptr.2d 193, in which the court held that a juvenile's painting in which he is depicting shooting a police officer does not constitute a criminal threat, does not alter our opinion that the writings in this case constitute a criminal threat. In that case, a month after Officer Lori MacPhail issued minor Ryan D. a citation for possessing marijuana, the minor turned in an art project for the high school painting class he was taking. The painting depicted a person who appeared to be a minor discharging a handgun at the back of the head of a female officer wearing the same badge number MacPhail wears. The painting depicted blood on the officer's hair and pieces of her flesh and face blowing away. (Id. at p. 858, 123 Cal.Rptr.2d 193.) When confronted about the painting, the minor admitted he was the shooter and MacPhail was the victim in the painting, that he was angry with MacPhail because of the citation, and that it was reasonable to expect she would eventually see the picture. (Ibid.) When shown the painting, MacPhail expressed concern that the shooting could be carried out. (Id. at p. 859, 123 Cal. Rptr.2d 193.) At the jurisdictional hearing, the minor testified the painting was an expression of his angry feelings, that he did not expect the painting to be shown to MacPhail, that he did not intend the painting to scare her, and that he turned in the painting expecting to get a grade or credit for it without getting in trouble. (Ibid.) In concluding that "the evidence fails to establish the minor intended to convey a threat to officer MacPhail and that, under the circumstances in which it was presented, the paining did not convey a gravity of purpose and immediate prospect of the execution of a crime that would result in death or great bodily injury to MacPhail[,]" (id. at p. 862,123 Cal.Rptr.2d 193) the court explained that the "ambiguity" of the painting's intent could be resolved "by surrounding circumstances." (Id. at p. 863, 123 Cal.Rptr.2d 193.) The court decided that the circumstances of that particular case did not support a finding that the minor's painting met the requirements of section 422 because (1) "[a]fter completing the painting, the minor took it to class and turned it in for credit," (2) nothing suggests the minor "remained in a rage" for the entire month between the incident which sparked the painting and its creation, (3) the minor did not display the painting to MacPhail, put it in a location where he knew she would see it, or communicate in any way with her to advise her that she should see the painting. (Id. at pp. 863-864, 123 Cal.Rptr.2d 193.) In light of the above circumstances, the court found that the evidence was insufficient to establish that, at the time the minor acted, he harbored the specific intent that the painting would be displayed to MacPhail. The court also found that, "under the circumstances, as a perceived threat the painting was not so unequivocal, unconditional, immediate, and specific as to convey a gravity of purpose and an immediate prospect of the execution of a crime against Officer MacPhail that would result in death or great bodily injury[,]" in part because it "was not accompanied by any words, on the painting or otherwise, such as `this will be you,' `I do have a gun, you know,' or `watch out'" and, in part, because the school authorities, the victim, and the police failed to take "immediate action" against the minor upon observing the painting. (Id. at pp. 864-865, 123 Cal. Rptr.2d 193.) By contrast, in the instant case, Julius did not write his alleged poems as part of a school assignment or *377 turn them into his English teacher for a grade or credit. Instead, he directly handed his writings to his victims, and he warned them and their parents to "watch" out because he could "be the next kid to bring guns to kill students at school."
In sum, we conclude there is sufficient evidence in the record to support the finding of the juvenile court that Julius made a threat within the meaning of section 422 and that he had the specific intent that his written statement was "to be taken as a threat." (Section 422.)
We similarly conclude there is sufficient evidence in the record to support the juvenile court's finding that the threats in question were "so unequivocal, unconditional, immediate, and specific as to convey to [Mary and Erin] a gravity of purpose and an immediate prospect of execution of the threat...." (Section 422.) "The use of the word `so' indicates that unequivocality, unconditionality, immediacy, and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim. The four qualities are simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim." (People v. Stanfield (1995) 32 Cal. App.4th 1152, 1157-1158, 38 Cal.Rptr.2d 328.) Here, Julius stated without qualification that he was dangerous and destructive and then said he could be the "next kid to bring guns to kill students at school." Since Julius gave the paper directly to Mary and Erin, each reasonably could believe the threat was directed at them as well as other students at their school, and the statement identified the means by which the threat would be carried out. The fact that Julius wrote a note explaining that this writing in "Faces" described "me and my feelings" belies his claim that "the vehicle is a poem, not a statement of personal intent to do anything." The fact that Julius made his threat near the end of Friday classes suggests the relatively immediate prospect of its execution on the following Monday. Mary learned of the threat near the end of her 6th period class on Friday. She left school as quickly as possible and within a half hour told her parents about the threat; the next morning, she e-mailed her English teacher a summary of the contents of the threat, and the teacher called the police after talking with Mary. Regarding Mary's perception of the immediacy of the threat, she testified that, upon hearing of the threat, she decided to leave the school campus "as fast as [she] possibly could" because she perceived the writing as a "death threat" and she therefore wanted to "get away from [Julius] and whatever thoughts he had in mind." She became "very frightened" and remained so throughout the weekend and the following week. She was afraid to go to school.
The fact that Julius's threat said he "can" be the next student to bring guns to school and kill students rather than he "will" be the next student to do so is not significant. As noted above, "the reference to an `unconditional' threat in section 422 is not absolute." (People v. Bolin (1998) 18 Cal.4th 297, 339, 75 Cal.Rptr.2d 412, 956 P.2d 374.) Only those threats "whose conditions preclude[ ] them from conveying a gravity of purpose and imminent prospect of execution" (People v. Stanfield, supra, 32 Cal.App.4th at p. 1161, 38 Cal.Rptr.2d 328) fall outside the statute. Nothing in Julius' threat contained such conditions.
We are convinced that Julius' written threat was "`on its face and under the circumstances in which it [was] made, ... so unequivocal, unconditional, immediate, *378 and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat[.]'" (People v. Toledo, supra, 26 Cal.4th at pp. 227-228, 109 Cal.Rptr.2d 315, 26 P.3d 1051.)
We next turn to Julius's argument that the evidence was insufficient to establish that either Mary or Erin experienced the reasonable "sustained fear" required by section 422. "The phrase to `cause[ ] that person reasonably to be in sustained fear for his or her own safety' has a subjective and an objective component. A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances." (In re Ricky T. (2001) 87 Cal. App.4th 1132, 1140, 105 Cal.Rptr.2d 165.) "Defining the word `sustained' by its opposites, we find that it means a period of time that extends beyond what is momentary, fleeting, or transitory." (People v. Allen (1995) 33 Cal.App.4th 1149, 1156, 40 Cal.Rptr.2d 7 [requirement met where defendant arrested 15 minutes after making armed threat to kill victim and her daughter].) The victim's knowledge of the prior conduct of the person making the threat is relevant in proving that the victim was in a state of sustained fear. (Ibid.)
Here, Mary testified that she was afraid when she first read the note, that she was afraid for the entire weekend, and that she was afraid to go to school. When Erin first read the note, she believed the words were "a threat to [her] life" and, at the time of the jurisdictional hearing, she still was "scared" by what she had read. She felt her life and the lives of her friends were "in danger ... just the fact that" Julius said he "can bring guns to school and kill students." The girls' fear was premised upon the words written on the page entitled "Faces," upon the fact that Julius did not do or say anything that would have led them to believe he was joking or not serious about the content of the writing, upon the fact that he handed them the paper despite barely knowing them, and upon the fact that there was no reason Julius would have shared this writing within the context of a school class or school assignment. In light of the previously described circumstances which precipitated the threat, we conclude there was substantial evidence in the record that Julius's threat that he could be the next student to come to school with guns and kill fellow students induced in Mary and Erin sustained fear which was reasonable under the circumstances.
In summary, we conclude substantial evidence supports the juvenile court's finding that minor George ("Julius") T. made two criminal threats within the meaning of section 422.

B. Remand for Juvenile Court to Declare Offenses Felonies or Misdemeanors
The People correctly concede that this case should be remanded with directions to the juvenile court to declare the offenses to be either felonies or misdemeanors.
Section 422 can be punished as either a misdemeanor or felony. Welfare and Institutions Code section 702 provides that, in a juvenile proceeding, "[i]f the minor is found to have committed an offense which would in the case of an adult be punishable alternatively as a felony or a misdemeanor, the court shall declare the offense to be a misdemeanor or felony." This "requirement is obligatory: `[Welfare and Institutions Code] section 702 means what it says and mandates the juvenile court to declare the offense a felony or misdemeanor.' [Citations.]" (In re Manzy W. (1997) 14 Cal.4th 1199, 1204, 60 Cal.Rptr.2d 889, 930 P.2d 1255.) The determinative *379 factor is whether the record demonstrates that the court actually exercised its discretion. (Id. at p. 1209, 60 Cal.Rptr.2d 889, 930 P.2d 1255.)
Here, where the record fails to show that the juvenile court declared the offenses misdemeanors or felonies, the matter must be remanded for this limited purpose.

III. Disposition
The dispositional order is reversed, and the matter is remanded to the juvenile court for the limited purpose of having the court declare the offenses to be either felonies or misdemeanors.
I CONCUR: BAMATTRE-MANOUKIAN, Acting P.J.
RUSHING, J., Dissenting.
While in his honors English class, the minor handed a classmate a poem entitled, "Faces," signed by "Julius, AKA: Angel." As a result of this conduct the minor is charged with a violation of Penal Code section 422, threats to commit crime resulting in death or great bodily injury. The majority are convinced that Julius's written threat "was `on its face and under the circumstances in which it [was] made, ... so unequivocal, unconditional, immediate, and specific as to convey as to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." (People v. Toledo (2001) 26 Cal.4th 221, 227-228, 109 Cal.Rptr.2d 315, 26 P.3d 1051; see Maj. Opn, ante, at p. 10.) Despite the majority's conclusion to the contrary, there is insufficient evidence to support a conviction under Penal Code section 422. Specifically, there was insufficient evidence of three of the five elements required to establish a violation of Penal Code section 422: that the minor intended to make a threat, that the purported threat was unequivocal, unconditional and communicated a gravity of purpose, and that the recipients of his poem reasonably feared for their safety. I would reverse. Therefore, I respectfully dissent.
The First Amendment of the United States Constitution guarantees the freedom of speech and expression. That guarantee is not without limitation. For example, language which incites imminent lawless action, (Brandenburg v. Ohio (1969) 395 U.S. 444, 448, 89 S.Ct. 1827, 23 L.Ed.2d 430) or language which constitutes a true threat are not protected by the First Amendment. (United States v. Kelner (1976) 534 F.2d 1020, 1027 (Kelner).) The latter is the exception at issue here.
Kelner, the seminal case on the criminal punishment of pure speech from which the language of Penal Code section 422 was lifted almost verbatim, analyzed the difference between protected speech and threats which could be punished criminally. Kelner considered those circumstances under which an unequivocal threat, which has not ripened into an overt act, is punishable under the First Amendment, even though it may also involve elements of expression. (Kelner, supra, 534 F.2d at p. 1026.) That case defined punishable, or "`true threats'" as "those which according to their language and context conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected `vehement, ...'" (Ibid.) The court continued: "only unequivocal, unconditional and specific expressions of intention immediately to inflict injury may be punished." (Id. at p. 1027; compare Pen.Code, § 422.)
Kelner found guidance from Watts v. United States (1969) 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (Watts). In Watts, the defendant, while participating in a political rally, said he would ignore a draft *380 notice and that, if the government made him carry a rifle, the first person he wanted to get his sights on was President Lyndon B. Johnson. (Id. at p. 706, 89 S.Ct. 1399.) The U.S. Supreme Court reversed the conviction because, under the facts, the statement was not a "true `threat'" but mere political hyperbole. (Id. at p. 708, 89 S.Ct. 1399.) Kelner found that, as in Watts, only true threats were punishable, and excluded threats, which in context, were conditional and made in jest. (Kelner, supra, 534 F.2d at p. 1026.)
The record is devoid of any evidence showing that the poem at issue here was either a threat on its face, or a threat under the circumstances in which it was made. And like much of the poetry written today in high schools and elsewhere, it was mere hyperbole. In finding the evidence sufficient to prove that the minor made a criminal threat, the trial judge focused on the language of the poem and the fact that the minor had given the poem to the two young women who he did not know well. Neither of these factors support the conclusion that the minor made a threat within the meaning of Penal Code, section 422.
The majority justifies their analysis of the poem by citing to the substantial evidence standard this court routinely uses in reviewing proceedings in a trial below. However, the interpretation of words is our task as well as that of the trial court. Unless the words used in the minor's poem have some special or technical use shown by other evidence in the case, we are bound to interpret their plain meaning and usage. We are not, nor is the trial court, allowed to confer meaning, as the Red Queen did in Alice in Wonderland[1] by saying a word means whatever I want it to mean. There is no controversy as to what the minor wrote nor is there any controversy or any dispute at all as to the circumstances under which the poem was published.
The minor, who was new to the school and knew few people, wrote a poem and gave it to a classmate in his honors English class. The top of the page said, "these poems describe me and my feelings. Tell me if they describe you and your feelings." He also asked the classmate if there was a poetry club at the school. The only reasonable conclusion from these words is that he meant to share his poem, and the feelings expressed, with a fellow student, perhaps to make a new friend based on a shared interest in poetry. Numerous times, the majority emphasizes that the young women to whom he gave the poems did not know him well, and that the class was not studying dark poetry at that time. The majority concludes that the minor had no reason other than to threaten the young women for giving them the poem. Given that the minor was new to the school and knew few people, the inference drawn by the majority is not reasonable. In fact, the only reasonable conclusion from the words "[t]ell me if they describe you and your feelings," and the question about a poetry club is that this lonely young man was searching for a way to spark a friendship at his new school by sharing his poem.
Even though the class was not specifically studying dark poetry at the time, it is telling that the minor chose an honors English class student, not one in his math, science, or history class. A student in an honors English class is simply more likely to be interested in poetry than some other student. If he intended to make a threat, he would have no interest in knowing what the recipient's feelings were or if they knew about a poetry club. Any student *381 would do. Instead, he chose a student who was likely to be interested in poetry and her friend, which can only support the conclusion that he intended to share the poem, not to make a threat. Therefore, I would conclude that there was insufficient evidence that the minor intended to make a threat.
Further, a purely semantic analysis of "Faces" reveals nothing unequivocal, unconditional immediate or specific as to convey to the person threatened, a gravity of purpose. The first portion of the poem speaks to the writers inability to identify with the world around him, his disconnected feelings and the paradox between his disdain and envy for the people who surround him. He writes, the "faces" around him who will "probably become the next doctors or [lawyers]" are "happy and vagrant." The choice of "vagrant" shows a creative use and an insight into the state of his classmate's minds. He wishes he "had a choice" on what "to be" like they do. He continues, "[t]hey make me want to puke." Surely this word cannot be taken as threatening. Justice Oliver Wendell Holmes said he knew when something was unconstitutional because it made him want to puke. The minor goes on to discuss his attempts to disguise his true self which he sees as worthless, "For I am Dark, Destructive, & Dangerous. I slap on my face of happiness but inside I am evil!!"
The poem concludes, "For I can be the next kid to bring guns to kill students at school. So parents watch your children cuz I'm BACK." The majority sees a true threat in these words, yet such a conclusion is inconsistent with both the plain meaning of the words used as well as the context in which they are used. Can is a word in day-to-day usage. Can, meaning to know how to or to be able to do,[2] simply stated, expresses ability, not intent. A man says, I can build a house. It does not mean that he has done it, that he will do it or that he wants to do it. He just means in his opinion, he has the ability to do it. You can eat as much as you like, does not mean that you should or will eat anything. Notwithstanding, the majority sees no "significant" difference between will and can.
Further, the concluding sentence follows his description of himself as "evil." Therefore, it does nothing more than describe the depth of evil he sees in himself, but does not threaten to do anything. No reasonable analysis could transform his expression of mere ability into an unequivocal, unconditional and immediate threat; nor does his statement of ability convey a gravity of purpose and immediate prospect of execution of the threat.
Further, in the context of a threat purportedly made in a poem, the style that the poem is written in can be as important as the words themselves in its understanding. The poem is "dark poetry," a current genre. Like most "dark poetry," the themes in "Faces" encompass topics such as loneliness, despair, abhorrence of society and social values and, of course, death. Dark poetry is not unlike "confessional poetry," which "uses detail from life to position the poem's speaker in psychic moments from which truthshilarious, grave, desperate, terrifying, fraudulentare spoken."[3] In the 1960's celebrated confessional poets such as Sylvia Plath, Robert Lowell and John Berryman, wrote similarly *382 angst filled and sometimes violent text. Had Lowell handed someone his poem, "Skunk Hour," where he wrote,
"I watched for love-cars. Lights turned down, they lay together, hull to hull, where the graveyard shelves on the town ... My mind's not right.
A car radio bleats, `Love, O careless Love ...' I hear my ill-spirit sob in each blood cell, as if my hand were at its throat ... I myself am hell; nobody's here."
Could it have been considered a threat?
Poems by the one of the twentieth century's best known poets, Allen Ginsberg, overcame censorship trials in the mid-twentieth century, but could also be described as dark and frightening. In "Howl" Ginsberg wrote,
"[W]hole intellects disgorged in total recall for seven days and nights with brilliant eyes, meat for the Synagogue case on the pavement, ...
"[¶][W]ho were burned alive in their innocent flannel suits on Madison Avenue amid blasts of leaden verse & the tanked-up clatter of the iron regiments of fashion & nitroglycerine shrieks of the fairies of advertising & mustard gas of sinister intelligent editors, or were run down by the drunken taxicabs of Absolute Reality, ...
"[¶][W]ith the absolute heart of the poem of life butchered out of their own bodies good to eat a thousand years....
"[¶] What sphinx of cement and aluminum bashed open their skulls and ate up their brains and imagination? ..." (Ginsberg, "Howl," in Collected Poems 1947-1980 (Harper & Row, 1984.)
Would a recipient of this celebrated poetry have felt threatened? Is the only distinction between this critically acclaimed poetry and "Faces," its recognition by the literary world? The minor here is neither a published nor recognized member of that huge American crowd of unknown versifiers. Does his "publication" to this individual audience transform his poem into a threat?
Penal Code section 422, by its own language, requires the court to consider the "circumstances in which [the statement] is made." (Pen.Code § 422.) The attendant circumstances here do not reveal an unequivocal and immediate prospect of execution. (In re David L. (1991) 234 Cal. App.3d 1655, 1660, 286 Cal.Rptr. 398.) The minor did not make other comments or engage in any other conduct which could indicate that he intended to threaten the young women with the poem, to the contrary he asked about the recipient's feelings and whether there was a poetry club. (In re Ricky T. (2001) 87 Cal. App.4th 1132, 1139, 105 Cal.Rptr.2d 165; compare: People v. Lepolo (1997) 55 Cal. App.4th 85, 88-90, 63 Cal.Rptr.2d 735 [evidence of eminent physical confrontation, raising a machete over the head while saying, "`I want that officer,'"]; People v. Martinez (1997) 53 Cal.App.4th 1212, 1218, 62 Cal.Rptr.2d 303 [circumstances after the threat which demonstrated a gravity of purpose]; People v. Mendoza (1997) 59 Cal.App.4th 1333, 1341-1342, 69 Cal. Rptr.2d 728 [past history of disagreements or quarrels between the defendant and the target.]; People v. McCray (1997) 58 Cal. App.4th 159, 172, 67 Cal.Rptr.2d 872 [past violence between the defendant and the target].)
The majority relies on the minor's serious demeanor and history of problems at other schools to conclude that he was not joking, but threatening. Given that his problems at other schools were in no way related to violent or threatening behavior, and given the serious subject of the poem "Faces," the minor's serious demeanor does not support the conclusion that he *383 was making a true threat. The defendant in Watts was likely not laughing or smiling when he made his statement. The court's focus, however, was not on whether he had a joking demeanor, but whether, under the circumstances, the statement made by the defendant could be nothing more than hyperbole.
The majority's attempt to distinguish In re Ryan D. (2002) 100 Cal.App.4th 854, 123 Cal.Rptr.2d 193, is unpersuasive. In that case, a police officer was shown a picture of a student shooting her in the back of the head and blowing away pieces of her flesh and face, she became frightened and the student was arrested and convicted of Penal Code section 422. (In re Ryan D., supra, 100 Cal.App.4th at p. 857, 123 Cal. Rptr.2d 193.) In Ryan D. the victim portrayed in the painting wore badge number 67, specifically identifying her as Officer Lori MacPhail who had recently arrested Ryan for possession of marijuana. Ryan said that he was angry at Officer MacPhail for his arrest and that the painting was meant to show his anger. This statement could be taken as a statement of intent. Officer MacPhail was frightened. Moreover, Ryan conceded it was reasonable to expect that Officer MacPhail would eventually see his painting. Nevertheless, the court in Ryan held that, "under the circumstances, as a perceived threat the painting was not so unequivocal, unconditional, immediate, and specific as to convey a gravity of purpose in an immediate prospect of the execution of a crime against Officer MacPhail that would result in death or great bodily injury." (Id. at p. 864, 123 Cal.Rptr.2d 193.) That court went on to note that the painting lacked words such as "`this will be you'" or "`I do have a gun, you know'" or "`watch out.'" (Ibid.)
I agree with the distinguished panel from the Third Appellate District that the school authorities were right in taking Ryan's painting seriously. Just as here, I think that the school authorities were well within their rights to take the minor's poem seriously and discuss it with him. However, because they did that does not justify his arrest. If anything, the circumstances of Ryan D. are more serious that those here because Ryan identified a specific victim and admitted that he was angry with the officer and hoped she would see the drawing. Nothing as specific occurred here. Yet, even under the more specific circumstance of Ryan D., that court found insufficient specificity to find a threat. As in Ryan D., none of the circumstances surrounding the minor's gift of the poem to either young woman supports the conclusion that the poem was an imminent or unequivocal threat.
The majority focuses on the fact that in Ryan D. the minor turned the painting in for credit, while here the minor did not. Surely the majority does not mean that a person's First Amendment rights are somehow curtailed or defined by whether a student can get credit for a piece of creative expression, or by whether such creative expression is a requirement.
The majority makes much of the admission by the minor that the poem could be frightening to the young woman. They focus extensively on the fear experienced by the young women who received the poems. However, in order to satisfy the statutory mandate of section 422, the recipient of the threat must not only be in sustained fear for her own safety, but that fear must be reasonable.
Poetry, as a form of artistic expression, is intended by its author to evoke emotion, sometime that emotion being fear. "[P]oetry ... [is] not intended to be and should not be read literally on [its] face, nor judged by a standard of prose oratory. Reasonable persons understand ... poetic *384 conventions as the figurative expressions which they are. No rational person would or could believe otherwise nor would they mistake ... poetry for literal commands or directives to immediate action. To do so would indulge a fiction which neither common sense nor the First Amendment will permit." (McCollum v. CBS, Inc. (1988) 202 Cal.App.3d 989, 1002, 249 Cal.Rptr. 187, fn. omitted.) "Go and catch a falling star"[4] is not a command. While the evidence is undisputed that these two young women were actually frightened by the poem, given the circumstances, context and content of the poem "Faces," I would conclude that their fears were not reasonable.
For all of the above stated reasons, I would reverse the order of the trial court.
NOTES
[1] Minor George Julius T. goes by the name of "Julius" both at home and at school. Accordingly, we shall refer to him by "Julius" throughout this opinion.
[2] All further calendar references are to the year 2001.
[3] Erin saw Julius give her friend Natalie a piece of paper folded in the same way. Erin did not know if Natalie had read the paper she was given.
[4] This writing was never shown or read to anyone at school.
[1] Carroll, alias Dodgson, "Alice's Adventures in Wonderland" (Great Britain, 1865).
[2] Merriam-Websters Tenth Collegiate Dictionary (1999) page 165.
[3] Good, Confessional Poetry: My Eyes Have Seen What My Hand Did, Fence Magazine, v. 1 n. 2 (as of Oct. 23, 2002).
[4] "Song." (1st stanza.)
 "Go and catch a falling star,
 Get with child a mandrake root,
 Tell me where all past years are,
 Or who cleft the Devil's foot,
 Teach me to hear mermaids singing,
 Or to keep off envy's stinging,
 And find
 What wind
 Serves to advance an honest mind."
(Donne, "Song," in The Norton Anthology of Poetry Revised (W.W. Norton & Company, Inc., 1975) pp. 1572-1631.)