[No. B082070. Second Dist., Div. Five. Feb. 28, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
BETTY JO STANFIELD, Defendant and Appellant.

**COUNSEL**

Alden Schwimmer for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter and Scott A. Taryle, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GRIGNON, Acting P. J.**—Defendant Betty Jo Stanfield appeals from her conviction of making terrorist threats. She threatened that if her former attorney did not join her in bringing her "Universe Reform Party" into power, she would hire gang members to kill him. Appellate decisions conflict as to whether a threat containing such conditional language supports a conviction under Penal Code section 422. (Compare *People* v. *Brooks* (1994) 26 Cal.App.4th 142 [31 Cal.Rptr.2d 283] ["if you testify, I'll kill you"—sufficient to support a conviction] with *People* v. *Brown* (1993) 20 Cal.App.4th 1251 [25 Cal.Rptr.2d 76] ["if you call the police, I'll kill you"—not sufficient].) Relying on *Brown*, a decision of Division Seven of this appellate district, defendant contends her conviction must be reversed. In accord with the Fourth District's decision in *Brooks*, we conclude that Penal Code section 422 may be violated by a threat containing conditional language. We affirm.

### PROCEDURAL BACKGROUND

Defendant was charged by information with making terrorist threats in violation of Penal Code section 422 and stalking in violation of Penal Code section 646.9, subdivision (a). A prior prison term was alleged pursuant to Penal Code section 667.5, subdivision (b). Defendant was convicted as charged. She was sentenced to four years in prison.[1]

### FACTS

John Foss is an attorney practicing law in Pasadena. Between 1979 and 1983, he practiced law in Bakersfield. During this time, he represented

---

[1]On May 25, 1994, defendant's appellate counsel filed an opening brief requesting independent review of the record by this court pursuant to *People* v. *Wende* (1979) 25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071]. On July 18, 1994, in light of the conflicting appellate authority, we requested counsel to brief the issue of whether the statute could be violated by a conditional threat. Defendant's appellate counsel then filed a supplemental brief addressing that issue, as well as raising insufficiency of the evidence as to the existence of any threat or any reasonable fear on the part of the victim. A respondent's brief was filed. Defendant subsequently submitted a brief, in propria persona, raising the issue of ineffective assistance of trial counsel. Based on the record on appeal, defendant has failed to establish ineffective assistance of counsel.

defendant in a legal matter, obtaining a favorable result. After the conclusion of that representation, Foss periodically received letters from defendant. He characterized the letters as "bizarre." The letters discussed women's rights, the tyranny of males, smokers' rights and politics. Cigarette holes were burned through some of the letters. Other letters mentioned defendant's skill with long-range firearms. Foss never answered the letters or spoke with defendant on the telephone.

On August 9, 1993, at 8 a.m., defendant called Foss's Pasadena law firm. The phone call was received by Donald Gormly, a law clerk at the firm. Defendant identified herself and stated she wanted Foss to join her Universe Reform Party. The Universe Reform Party is defendant's own political party, of which defendant appears to be the only member. Defendant told Gormly, "She was forming the Universe Reform Party . . . and was going to take that into the United Nations and [Foss] better join up or get on the band wagon or something and if he didn't she had a thousand dollars and she was going to hire gang bangers to kill or get him." Gormly first thought the call was a joke, but as it continued, he perceived it as a threat. Defendant did not indicate she wished to retain Foss. Gormly left Foss a message concerning the threat on the receptionist's desk.[2]

Foss was informed of the message that day but did not read it until he came to the office the next day, August 10. The threat made Foss nervous and scared. Although he had previously received communications from defendant, he had never received such a direct and explicit death threat. That same day, Foss received a handmade postcard from defendant. The message on the postcard began with the language, "For your mother's sake," and asked Foss to think about certain issues. The face of the postcard was a newspaper article detailing a United Nations study concerning the United States's drop in international ratings with respect to the treatment of women. The postcard's return address was from a city in the Los Angeles area. This further frightened Foss because defendant's previous letters had been sent from penal or mental institutions out of the area. This postcard indicated to Foss that defendant was near and no longer in custody.

The following day, defendant and an unidentified woman hand delivered a package to Foss's office. Another attorney, Frank D'Oro, was told of the package's arrival and examined it. The package was in a plastic bag and was addressed to Foss from defendant. A strong odor emanated from it. D'Oro was concerned and removed the package to the office's garage area, leaving

---

[2]The message addressed to Foss stated that Stanfield of the Universe Reform Party had called at 8:05 a.m. on August 9, 1993, and stated: "Has 1000.00 to pay to gang banger to take care of you. She will call back at 1:30 today."

it near the dumpster. When Foss arrived at the office, he was informed of the package and went to the dumpster to examine it. After a brief examination in which he recognized defendant's writing on the package's brown paper wrapping, Foss called the police. The Pasadena Police Department notified the Los Angeles County Sheriff's Department Bomb Squad, who evacuated the office building and a nearby apartment building. The bomb squad detonated the package without destroying its contents. Foss had an opportunity to view the contents of the package: many papers with writing on them, a manila envelope and a long-dead cat.[3] Some of the documents in the package contained threatening statements. One envelope read, "Not reading this will cost you your life." A letter stated, "I am not bluffing. If you don't want anything further to do with this case, I intend to arrange happy motivated paid gang bangers, carjacking with fatality." Foss was shown, or informed of, some of the contents of the box.

The package further frightened Foss, because it indicated that defendant had the ability to deliver objects to his office. The box was not the last communication Foss received from defendant. The next day, he received an envelope which had writing on the outside, but appeared to be empty. As a result of the package, Foss changed his driving routes and times, paid particular attention to the people around him and advised his wife to do the same. After defendant was taken into custody, Foss was less concerned with these precautions.

Defendant admitted making the phone call, sending the postcard and delivering the package. She admitted making the threatening statement in the phone call, although she contended her statement had been taken out of context. She admitted the phone call was the first time she had ever made a death threat to Foss. She stated she had been attempting to retain Foss. Defendant intended to run for President of the United States and wanted Foss to join her as the vice-presidential candidate of her Universe Reform Party. She wanted Foss to go to the United Nations to correct our corrupt society. She intended her statement about gang bangers to be a "master-slave joke." "In other words, if he was not a women's right[s] activist, a gang banger might be a women's rights activist and not feel charmed by anyone that was putting anybody down." She admitted saying, "I have a thousand dollars to hire Mr. Foss as a partial retainer fee, and will also pay for a lot of happy hobos or a motivated gang banger to arrange a carjacking with or without fatality." She did not intend to harm Foss, and was only exaggerating or bluffing to guarantee Foss would be "part of the solution, not part of the problem."

---

[3]The police logged the contents of the package, which also included a white bra with an earring attached, a cloth, a book entitled Sexist Justice and articles on women's rights.

Defendant sent the dead cat as "more of an attention getter" than a threat. She did not think defendant would be in fear, although she acknowledged that "traditionally dead things are supposed to mean a threat."

## DISCUSSION

Penal Code section 422 provides in pertinent part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

■ Defendant contends the use of the word "unconditional" in the statute requires that a threat be absolutely unconditional in order to support a conviction. Her threat, that *if* Foss did not join her Universe Reform Party, she would hire gang members to kill him, was conditional, at least in a purely grammatical sense. Thus, this case squarely presents the issue of whether a conviction for making terrorist threats is supported by a threat which is prefaced by a condition.

*Statutory Language*

"The fundamental rule of statutory interpretation is to ' "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citation.] In determining intent, the court looks first to the words themselves." (*In re Ge M.* (1991) 226 Cal.App.3d 1519, 1522-1523 [277 Cal.Rptr. 554].)

The language of Penal Code section 422 requires the threat to be "*so* unequivocal, unconditional, immediate, and specific *as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat* . . . ." (Italics added.) The statute punishes those threats which convey to the victim a gravity of purpose and an immediate prospect of execution. The use of the word "so" indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim. The

four qualities are simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim.

This conclusion was reached by the Fourth District in *People* v. *Brooks*, *supra*, 26 Cal.App.4th at page 149. Brooks had threatened a witness to a robbery that if she testified against the suspected perpetrators, he'd kill her. (*Id.* at p. 144.) Brooks's conviction of violating Penal Code section 422 was affirmed on appeal. The *Brooks* court held that to interpret Penal Code section 422 to encompass only absolutely unconditional threats would make meaningless the Legislature's use of the word "so." Moreover, such a construction would lead to the absurd result that any threatener could escape punishment by simply appending to an otherwise unconditional threat any condition, including "if the sun rises tomorrow." The statute does not require this result because it does not concentrate on the precise words of the threat. Instead, the statute focuses on the effect of the threat on the victim, to wit, communication of a gravity of purpose and immediate prospect of execution of the threat. These impressions are as surely conveyed to a victim when the threatened harm is conditioned on an occurrence guaranteed to happen as when the threat is absolutely unconditional. (*Ibid.*)

Indeed, the language "so . . . unconditional" implies that there are different degrees of unconditionality. A threat which may appear conditional on its face can be unconditional under the circumstances. For example, the threat, "you all better have my personal items to me by five o'clock today or its going to be a lot of hurt people there," was found to be sufficiently unconditional when "there was no way that the defendant's personal property could be delivered to him by the five o'clock deadline to which he referred" and the victim therefore had a reasonable apprehension that defendant would act in accordance with the threat. (*United States* v. *Cox* (6th Cir. 1992) 957 F.2d 264, 265-266.)

Language creating an apparent condition cannot save the threatener from conviction when the condition is illusory, given the reality of the circumstances surrounding the threat. A seemingly conditional threat contingent on an act highly likely to occur may convey to the victim a gravity of purpose and immediate prospect of execution. It is that end which violates the statute. An absolutely unconditional threat is only one of several means by which that end may be accomplished.

A contrary result was reached by Division Seven of this appellate district in *People* v. *Brown*, *supra*, 20 Cal.App.4th 1251, which concluded that the condition, "If you call the police," took a threat to kill the victim outside the

scope of the statute, based on the use of the word "unconditional" in the statute. This analysis, which considered the word "unconditional" in isolation instead of in the context of the remainder of the statutory language, was recently rejected as simplistic in favor of the *Brooks* analysis by Division Two of this appellate district in *People* v. *Gudger* (1994) 29 Cal.App.4th 310 [34 Cal.Rptr.2d 510]. As discussed above, we believe the language of the statute itself compels the *Brooks* result and, thus, decline to follow *Brown*.

*Legislative Intent*

In light of the conflicting authority interpreting the word "unconditional" in Penal Code section 422, we find it useful to confirm our interpretation of the statutory language with consideration of the intent of the Legislature, although we believe the statutory language unambiguously mandates the result reached above.

The genesis of the language in Penal Code section 422 is well known. In 1981, the California Supreme Court invalidated former section 422 as unconstitutionally vague. (*People* v. *Mirmirani* (1981) 30 Cal.3d 375, 388 [178 Cal.Rptr. 792, 636 P.2d 1130].) The statute was repealed in 1987, and a substantially revised statute was enacted in 1988. (Stats. 1987, ch. 828, § 28, p. 2587; Stats. 1988, ch. 1256, § 4, pp. 4184-4185.) The relevant statutory language was adopted almost verbatim from *United States* v. *Kelner* (2d Cir. 1976) 534 F.2d 1020 [34 A.L.R.Fed. 767], a case which discussed the boundaries imposed by the First Amendment on the punishment of threats. (*People* v. *Fisher* (1993) 12 Cal.App.4th 1556, 1560 [15 Cal.Rptr.2d 889].) Because the language of the California statute was drafted to comport with *Kelner*, we can gain insight on the meaning of the statutory language from *Kelner*, its antecedents, and subsequent interpretations by other courts of the *Kelner* language incorporated into section 422 of the Penal Code.[4]

To properly understand *Kelner*'s use of the word "unconditional," we must first consider the case of *Watts* v. *United States* (1969) 394 U.S. 705

---

[4] The *Brooks* opinion relied on the general development of federal law subsequent to *Kelner* in determining the meaning of the California statute. (*People* v. *Brooks*, *supra*, 26 Cal.App.4th at pp. 146-149.) To the extent *Brooks* relied on cases that may have implicitly differed from the *Kelner* rule, we respectfully disagree with its analysis. The California Legislature has chosen to codify the *Kelner* rule. While it is appropriate to consider other courts' interpretations of this rule, it is inappropriate to consider subsequent developments in First Amendment jurisprudence. At the time it was enacted, Penal Code section 422 may have been intended as the broadest terrorist threat statute possible under First Amendment restrictions. However, the Legislature did not choose to use terminology that would allow the statute to grow in accordance with First Amendment jurisprudence, and has instead frozen California law at the *Kelner* formulation.

[22 L.Ed.2d 664, 89 S.Ct. 1399] on which *Kelner* relied. Watts was convicted of threatening the President of the United States. He had stated, in a small discussion group during a political rally, "And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. [President Lyndon B. Johnson]." (*Id.* at p. 706.) The Supreme Court reversed Watts's conviction, holding that the trial court erred in denying his motion for acquittal. Defense counsel had stressed the alleged threat "was made during a political debate, that it was expressly made conditional upon an event—induction into the Armed Forces—which [Watts] vowed would never occur, and that both [Watts] and the crowd laughed after the statement was made." (*Id.* at p. 707.) The Supreme Court concluded that taken in context, and considering the conditional nature of the threat and the reaction of the listeners, the only possible conclusion was that the statement was not a punishable "true threat," but was rather political hyperbole privileged under the First Amendment. (*Id.* at pp. 707-708.) The *Watts* threat was not merely conditional in the abstract, but conditioned on an event which the defendant "vowed would never occur." Thus, far from conveying an immediate prospect of execution, this threat explicitly contained a condition the defendant promised would not come to pass.

*United States* v. *Kelner, supra,* 534 F.2d 1020, involved a televised press conference called by the Jewish Defense League in which Kelner, dressed in military fatigues and armed with a weapon, stated that his group was going to kill Yasser Arafat, who was to be in New York for a meeting of the United Nations. When questioned by the media, Kelner stated that the assassination had already been planned, and that it would indeed "come off." (*Id.* at p. 1021.) At his trial for communicating a threat in interstate commerce, Kelner argued that his statement was political hyperbole protected by the First Amendment rather than a punishable true threat. Kelner contended that in order for a threat to be a true threat, the threatener must have specifically intended to carry it out. (*Id.* at p. 1025.)

The *Kelner* court disagreed. Instead of an inquiry as to the defendant's intent to carry out the threat, the Second Circuit concluded the Constitution mandated only an inquiry as to whether the threat convincingly expressed an intention of being carried out. (*United States* v. *Kelner, supra,* 534 F.2d at p. 1027.) The *Kelner* court formulated this requirement in several interchangeable ways. Thus, in addition to the language incorporated in Penal Code section 422, the court also defined true threats as "only those which according to their language and context conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected

[attacks on government and political officials]." (*Id.* at p. 1026.) In adopting this formulation, the Second Circuit relied on *Watts*. The reversal of Watts's conviction because his threat was a jest and used conditional language was simply an illustration of the general principle that only threats which express an intention of being carried out are punishable true threats, not the adoption of a bright-line test based on the whether the defendant used conditional language. (See *ibid.*)

Clearly, the *Kelner* court did not intend "unconditionality" to prohibit punishment of threats including "if" language. This is evidenced by its discussion of the "purpose and effect" of the "true threat" requirement. It "is to insure that only unequivocal, unconditional and specific expressions of intention immediately to inflict injury may be punished—only such threats, in short, as are of the same nature as those threats which are . . . 'properly punished every day under statutes prohibiting extortion, blackmail and assault . . . .'" (*United States* v. *Kelner, supra,* 534 F.2d at p. 1027.) By definition, extortion punishes conditional threats, specifically those in which the victim complies with the mandated condition. (See Pen. Code, § 518 ["Extortion is the obtaining of property from another, with his consent, . . . induced by a wrongful use of force or fear . . . ."]; Pen. Code, § 519, subd. 1 [fear such as will constitute extortion may be induced by a threat to do unlawful injury to the victim].) Likewise, many threats involved in assault cases are conditional. A conditional threat can be punished as an assault, when the condition imposed must be performed immediately, the defendant has no right to impose the condition, the intent is to immediately enforce performance by violence and defendant places himself in a position to do so and proceeds as far as is then necessary. (*People* v. *McCoy* (1944) 25 Cal.2d 177, 182, 193 [153 P.2d 315] [assault with a deadly weapon accomplished by defendant's demand, with knife held over victim, that victim not make any noise or the knife will be used].) It is clear, then, that the *Kelner* court's use of the word "unconditional" was not meant to prohibit prosecution of all threats involving an "if" clause, but only to prohibit prosecution based on threats whose conditions precluded them from conveying a gravity of purpose and imminent prospect of execution.

Cases subsequent to *Kelner* have reached the same result. In *United States* v. *Malik* (2d Cir. 1994) 16 F.3d 45, 51, the Second Circuit upheld the following jury instruction as "substantially follow[ing] the language of [*Kelner*]":[5] "A threat is a statement expressing an intention to inflict bodily harm to someone of such a nature as could reasonably induce fear as distinguished from idle, careless talk, exaggeration or something said in a

---

[5]The particular language the instruction was found to have followed was the precise language adopted by the California statute.

joking manner. You must determine whether the threat was a true threat when judged in its context [— a] serious expression of intent to inflict injury and not merely a vehement or emotional expression of political opinion, hyperbole or arguments against government officials. [¶] Among other things, you should consider whether on their face and in the circumstances in which they were made defendant's statements were so unequiv[o]cal, unconditional and specific as to convey to the recipient a gravity of purpose and apparent prospect of execution."

Under the *Kelner* language adopted in Penal Code section 422, conditionality is only one circumstance to be considered in the overall analysis of whether the threat is a true threat, and is not a bright line separating actionable threats from protected ones.

*Substantial Evidence*

■ Because we have concluded the use of the word "if" in defendant's threat does not absolve defendant from liability, her substantial evidence challenge is easily resolved. Defendant threatened to hire someone to kill Foss if he did not join her Universe Reform Party. Although grammatically conditional, this threat contained a considerable degree of unconditionality, since compliance with defendant's condition would be practically impossible. The other three factors, unequivocality, immediacy and specificity, were also present in significant degrees. The threat was directed to Foss and specifically identified not only the manner in which it would be carried out (carjacking), but confirmed defendant's possession of the means to accomplish it ($1,000 to hire gang members). The threat was also unequivocal and immediate. If Foss refused to join the party (a virtual certainty), the injury would occur. Thus, each of the four factors was sufficiently present to convey to Foss a gravity of purpose and imminent prospect of execution. As a result of the threat, Foss was frightened and nervous and altered his habits in order to preserve his safety. The jury's conclusion the threat was sufficiently unequivocal, unconditional, immediate and specific to convey to Foss a gravity of purpose and imminent prospect of execution was thus supported by substantial evidence and will be upheld.

Defendant also contends that there may not have been a threat at all and Foss's fear for his safety was not reasonable. Because Gormly did not immediately give the phone message to Foss and Foss did not immediately contact the police, defendant claims Foss must have known the phone call was "just another in a long series of foolish, harmless communications" from her. We disagree. The telephone call was concededly different from all earlier communications Foss had received from defendant, in that it contained an explicit death threat. Gormly could not have immediately notified

Foss of the phone call; he did not know how to reach Foss. Foss did not call the police until after receiving the package because the package greatly changed the circumstances of the earlier threat. The postcard had indicated to Foss that defendant was no longer in an institutional setting and was in the Los Angeles area. The package proved that defendant had access to Foss's office. Nor was the package an innocent collection of documents, but it contained a threatening item—the dead cat. All of these circumstances combined to make the telephoned death threat more threatening than it originally appeared and provided substantial evidence to support the jury's verdict.

DISPOSITION

The judgment is affirmed.

Armstrong, J., and Godoy Perez, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 1, 1995.