**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert Duke WATTS, aka Richard
Warran Watts, Defendant–
Appellant.**

No. 03–50013.
D.C. No. CR–99–01359–GAF.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 1, 2004.

Decided April 15, 2004.

---

Ronald L. Cheng, Esq., Stephen Kramer, Esq., Erik M. Silber, Esq., Los Angeles, CA, for Plaintiff–Appellee.

Cara DeVito, Esq., West Hills, CA, Robert Duke Watts, Reg. 15799–112, Los Angeles, CA, for Defendant–Appellant.

Before MAGILL,* TROTT, and CALLAHAN, Circuit Judges.

## MEMORANDUM **

Robert Duke Watts appeals the district court's order revoking his term of supervised release and sentencing him to eighteen months in prison to be followed by eighteen months supervised release.

Watts argues that the district court erred in finding by a preponderance of the evidence that he committed a "Grade A" violation, as defined by the policy statement in § 7B1.1(a)(1) of the Sentencing Guidelines, and therefore improperly relied on the Grade A, rather than the Grade B, sentencing range found in § 7B1.4(a). We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

This court reviews a district court's revocation of supervised release for abuse of discretion. *United States v. Turner*, 312 F.3d 1137, 1142 (9th Cir.2002). To revoke supervised release, a district court must find a violation of its terms by a preponderance of the evidence, which the government bears the burden of establishing. 18 U.S.C. § 3583(e)(3); *Turner*, 312 F.3d at 1142.

As the parties are familiar with the facts, we do not relate them in detail. Watts' underlying conviction was for both making a false statement and using a false document in a passport application. He was sentenced to ninety-seven days in prison and two years supervised release. Watts is alleged to have violated the terms of his supervised release on seven different occasions. All but one relate to a long-standing conflict between Watts and the Los Angeles County Department of Children and Family Services ("DCFS") over its refusal to give Watts custody of his daughter, Cherry Watts. As Watts became frustrated with the DCFS's position, he began to threaten various people involved in the dispute, including: Tom Morris, the social worker handling Cherry's case; Heidi Ingalsbe, Morris's co-worker; Judge Michael Nash of the Juvenile De-

---

* Honorable Frank J. Magill, Senior United States Circuit Judge for the United States Court of Appeals, Eighth Circuit, sitting by designation.

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36–3.

pendency Court, Los Angeles County; and Michel Eisner, an attorney who represented DCFS.

Watts' probation officer alleged that Watts violated the terms of his supervised release by (1) making a criminal threat on June 21, 2000, in violation of California Penal Code § 422; (2) possessing two firearms in violation of the conditions of his supervised release; (3) being convicted of stalking in violation of California Penal Code § 646.9(a), with part of the conduct occurring during supervised release; (4) making a criminal threat on March 30, 2000; (5) making a criminal threat on or about June 9, 2000; (6) making a criminal threat on or about June 14, 2000; and (7) making a criminal threat on or about June 19, 2000.[1]

■ At the conclusion of two hearings, the district court found all but Count 5 to be proven by a preponderance of the evidence. It then revoked Watts' supervised release, and imposed a sentence of eighteen months in prison to be followed by eighteen months supervised release.[2] When sentencing Watts, the court considered a range of fifteen to twenty-one months, which is the range suggested in § 7B1.4(a) for a Grade A violation of terms of release committed by a defendant with a criminal history category of II. U.S.S.G. § 7B1.4(a).

Watts does not contend the district court erred in revoking his supervised release. The Guidelines provide that "[u]pon a finding of a Grade A or B violation, the court shall revoke probation or supervised release." U.S.S.G. § 7B1.3(a)(1). While Watts contests the Grade A findings, he does not dispute Count 3, the firearms possession charge. Moreover, his argument that the court improperly relied on his *nolo contendere* plea entered in state court in the course of finding Count 2 to be proven is directly refuted by this court's opinion in *United States v. Verduzco*, 330 F.3d 1182 (9th Cir.2003). Counts 2 and 3 are both Grade B violations, and revocation is mandatory for possession of firearms. 18 U.S.C. § 3583(g)(2). These violations provide ample support for the court's decision to revoke supervised release.

■ Rather than contest the revocation itself, Watts argues that having chosen to follow the sentencing policies contained in Chapter 7 of the Guidelines, the district court erred in applying the range for a Grade A violation rather than a Grade B violation.[3] Watts challenges the court's findings that he made criminal threats in violation of California Penal Code § 422 on the four different occasions constituting Counts 1, 4, 6, and 7. A criminal threat satisfying the requirements of § 422 is considered to be a crime of violence, and thus a Grade A violation. *Rosales–Rosales v. Ashcroft*, 347 F.3d 714, 717 (9th Cir. 2003) (holding that conduct violating § 422 also constitutes a crime of violence as the term is defined by 18 U.S.C. § 16(a), which is nearly identical to the definition in

---

1. Each of the latter criminal threat counts were alleged violations of § 422.

2. Watts has served his prison term, and is currently on supervised release. As the parties acknowledge, Watts' claim is not moot because the relief he seeks could entail a shorter period of supervised release. *United States v. Verdin*, 243 F.3d 1174, 1178 (9th Cir.2001).

3. It is undisputed that the court sentenced Watts to terms of imprisonment and supervised release within the statutory maxima, 18 U.S.C. § 3583(e)(3) & (h), and that the policy statements contained in Chapter 7 of the Guidelines are merely advisory. *United States v. Garcia*, 323 F.3d 1161, 1164 (9th Cir.2003).

U.S.S.G. § 4B1.2(a)(1), referred to in commentary note 2 to § 7B1.1).

California Penal Code § 422 punishes:

Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety. . . .

We hold the district court properly found by a preponderance of the evidence that Watts violated this provision on at least one of the occasions alleged.[4] A finding that Count 7 was proven by a preponderance of the evidence is supported by the hearing record. In the June 19, 2000, letter forming the basis of that count, described in detail below, Watts included a picture of the grave of Cherry's maternal grandmother, and wrote in an accompanying note that "[t]his is what happens to assholes who keep fathers & daughters apart." Government's Excerpts of R. ("GER") at 7. By the time Morris received the letter, he had been subjected to long-standing harassing conduct by Watts. Even before Watts began supervised release on the passport charges, he apparently threatened Morris in 1998 and

stalked Morris between April 24, 1996, and June 21, 2000. Watts entered pleas of *nolo contendere* to both of these charges in state proceedings.[5] On another occasion, Morris was walking with Cherry Watts toward the entrance of the Edelman Court Building for a supervised visit with Watts. As Morris approached the building, he heard someone call "Cherry," and when Cherry ran to Watts, who had been hiding behind a planter, Watts gestured toward Morris as if he were shooting him. Less than three months prior to receiving the June 19 letter, Morris was informed of a phone call made on March 30, 2000, in which Watts told Ingalsbe that in an Alcoholics Anonymous meeting he had said, "I haven't killed anyone today. I would like to kill Tom Morris." *Id.* at 175. Morris had warned Watts that he took his threats seriously, to which Watts insisted that he wanted Morris to take them seriously. *Id.* at 185.

It is against this background that Morris received the June 19, 2000, letter. The letter contained a 1990 picture of Cherry Watts with Kathleen Stover, her maternal grandmother. GER at 7. Stover has an X drawn through her head. The letter indicated that the picture is of Stover and that she was Cherry's grandmother. It included a card from All Souls Cemetery noting that Stover had been interred on March 20, 1992, as well as a picture of her headstone. Watts wrote on the card, "This old 'bag' had nerve enough to tell me: 'why don't you just go away.'" *Id.* The letter also included a card indicating that Stanley Cohen, Stover's attorney, had been buried

---

**4.** We express no opinion as to whether the district court was correct in finding that Watts actually committed four infractions of § 422 because it is not essential to our holding. Section 7B1.1(b) of the Guidelines states, "[w]here there is more than one viola-tion of the conditions of supervision . . . the grade of the violation is determined by the violation having the more serious grade."

**5.** The stalking incident also forms Count 3 of these proceedings.

at Pacific Crest Cemetery. The letter further contained a handwritten note stating:

> Hey Morris, (Just 2 of 11). This is what happens to assholes who keep fathers & daughters apart. God is in charge. I can't believe God has let you stay alive, not sick & still on our, case this, long!! Just a matter of time, B4 I dance on *your* grave you child-stealer.

*Id.* Morris reasonably interpreted "Just 2 of 11" to refer to an earlier letter he had received from Watts entitled "People who are judged by God," which contained ten names and an ominous eleventh blank line. Notations accompanying the ten names indicated that each was dead or ill, and one of the names was Stover's. Morris assumed the eleventh line was meant for him. Morris testified the June 19 letter upset him, and he interpreted its import to be that "in keeping Cherry from her father that I'm going to end up dead." AER at 189. He also testified that upon receiving the letter, he viewed Watts' threatening behavior as escalating, and notified his supervisor, local police, and Watts' probation officer. *Id.* at 194.

█ In light of the contentious relationship between Watts and Morris and the repeated aggressive and threatening behavior Morris had been subjected to, the district court did not err in finding by a preponderance of the evidence that Watts' conduct in sending the June 19 letter violated § 422. Watts argues that the threat was not "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." Cal.Penal Code § 422. If § 422 required a threat to be unequivocal, unconditional, immediate, and specific in absolute terms, Watts' argument would be highly persuasive. His letter, though certainly foreboding, is far from unequivocal. However, California courts, in accordance with the structure of the sentence in which those terms are placed, have interpreted the statute somewhat more loosely.

First, the statute itself does not demand that a threat be absolutely unequivocal and immediate, but rather only *"so* unequivocal, unconditional, immediate, and specific *as to convey ... a gravity of purpose and an immediate prospect* of execution of the threat." Cal.Penal Code § 422; *People v. Bolin,* 18 Cal.4th 297, 75 Cal.Rptr.2d 412, 956 P.2d 374, 404 (1998) (" 'The use of the word 'so' indicates that the unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' ") (quoting *People v. Stanfield,* 32 Cal.App.4th 1152, 1157, 38 Cal.Rptr.2d 328 (Cal.Ct.App.1995)). Second, California courts commonly look to the circumstances surrounding an alleged threat in determining whether a violation occurred. *See, e.g., In re Ryan D.,* 100 Cal.App.4th 854, 860, 123 Cal.Rptr.2d 193 (Cal.Ct.App.2002). Given this construction of § 422, the district court did not err in finding that Watts' conduct satisfied the statute's requirements. Morris was justified in believing, based on his long history with Watts, that Watts would not be content to wait for God's judgment on the Los Angeles County Department of Children and Family Services, but would instead attempt personally to hasten the coming of that day. Moreover, Morris's testimony that Watts' threatening behavior had been escalating is sufficient to satisfy the immediacy requirement.

Finally, Watts contends that even assuming he caused *actual* fear in those he threatened, such fear was not "reasonable," as is required by § 422. Here again, in light of the longstanding nature of Watts' threats, Morris's knowledge of

the intensity with which Watts desired to obtain custody of his daughter, as well as the escalating nature of the threats, we cannot say the district court erred in holding Morris's fear to be reasonable.

Having determined the district court properly found a Grade A violation by a preponderance of the evidence, we further hold it did not abuse its discretion by sentencing Watts to terms of imprisonment and supervised release within the range suggested by § 7B1.4(a).

For the foregoing reasons, the district court's revocation of Watts' supervised release and imposition of an eighteen month prison sentence and eighteen month term of supervised release is AFFIRMED.

---

* This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.