Filed 1/5/21  P. v. Martin CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B303064 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA076747) |
| v. | |
| JARED ANDREW MARTIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shannon Knight, Judge.  Affirmed.

Alan E. Spears, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Christopher G. Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

Jared Andrew Martin appeals from a judgment entered after a jury convicted him of one count of making a criminal threat (Pen. Code, § 422, subd. (a)).[1]  The jury also found true the allegation Martin personally used a deadly or dangerous weapon (a knife) in the commission of the offense (§ 12022, subd. (b)(1)).  On appeal, Martin contends there was not sufficient evidence (1) his conduct conveyed a gravity of purpose and an immediate prospect of execution of the threat and (2) the victim was placed in sustained fear.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Evidence at Trial*

About 6:00 p.m. on May 6, 2019 Jason Solomon was riding on a Metrolink train from Santa Clarita to Lancaster.  Solomon was seated on the upper deck of a multilevel car when he heard "a lot of rumbling" that drew him and other passengers to the stairwell at the south end of the car.[2]  Looking down the stairwell, Solomon saw a younger man (Raphael Brown) hitting an older man (Martin) while Martin had his back against a window.[3]  Solomon went down the stairs, grabbed Brown, and

---

[1]    All further statutory references are to the Penal Code.

[2]    Solomon used "north" and "south" in his testimony to describe where on the train the incident occurred.  Because the train was generally headed northbound between the Via Princessa and Acton stations at the time of the incident, the south end of the train car would have been toward the rear of the train, and the north end toward the front.

[3]    Solomon identified Martin at trial.  Before the incident Solomon did not know Martin or Brown.

pulled him off Martin. Solomon pushed Brown towards the north end of the train car in an effort to break up the fight between the two men, at which point Brown walked off to the north.

Solomon turned his attention back to Martin and noticed Martin was holding two knives, one in each hand. The knives were each seven to nine inches long and looked like "throwing knives." At this point, Martin was standing three and a half feet away from Solomon, while a Metrolink security guard stood slightly in front of and to the right of Solomon. As Solomon tried to calm Martin down, Martin angrily stated, "I'm tired of these young niggers fucking with me." Martin then said to Solomon, "Get out of my way." Solomon said "no." Martin then looked Solomon squarely in the eyes and stated, "Get out of my way or I'm going to kill you." As Martin "threatened" Solomon, the tips of Martin's knife blades were pointed directly at Solomon.

After about five seconds, Solomon stepped back, believing Martin "was already ready to go ahead and do whatever he wanted to do with the two knives in his hand." Solomon testified he thought of his wife and son, and how "if I get stabbed and die, I'm gone. My wife is a widow. My son don't have a father. [T]hat made me step back." Solomon then tried "to step out of the situation" while still "looking to the car[] as far as the other people on the train." Solomon walked north on the train car to try to find Brown and make sure Brown was not in Martin's view. Martin followed Solomon. As Solomon reached the north end of the car, he noticed several children, families, and commuters sitting in the next car, so he faced Martin and told Martin to turn around. Martin began to walk back to the south, and Solomon followed Martin part of the way. At this point, Solomon did not know where the security guard had gone.

Martin ultimately returned to the seating area at the southern end of the train car where Solomon had originally encountered him, sat down, and began to laugh. Solomon did not understand Martin's laugher to mean Martin's earlier words had been a joke, although Solomon thought the situation had been "defused." Solomon remained on the stairs near the southern end of the train until the train reached the next station so he could watch Martin because he "didn't know if anything would spark as far as [Martin's] attitude, anger, or whatever." When the train stopped in Acton, Martin got up, left his belongings behind, and disembarked from the southernmost car of the train "like nothing happened." Solomon also got off the train and watched as the police detained Martin.[4] Solomon thought about the incident "every other day for like two weeks, just because of the whole knife thing, the threatening. Just the entire situation could have went left where somebody really could have like died or something like that . . . ."[5]

---

[4] Los Angeles County Sheriff's Deputy Thomas Halaszynski testified he was dispatched to the Acton Metrolink station to respond to a call of an assault with a deadly weapon on the train. Arriving at the scene, Deputy Halaszynski saw Brown, who sustained stab wounds on his back, being taken into an ambulance to be transported to the hospital. Deputy Halaszynski recovered two knives from the train security guard, and he interviewed Martin, who stated Brown had assaulted him, causing Martin to use the knives in self-defense.

[5] Martin did not testify or present any other evidence at trial.

B.    *The Information, Verdict and Sentencing*

The amended information charged Martin with one count of making a criminal threat (§ 422, subd. (a); count 2)[6] and specially alleged Martin personally used a knife in the commission of a felony (§ 12022, subd. (b)(1)).  Martin pleaded not guilty and denied the special allegation.

The jury found Martin guilty of making a criminal threat and found the special allegation true.  The trial court sentenced Martin to three years in state prison, comprised of the middle term of two years for making a criminal threat, plus one year for the weapon enhancement.  Martin timely appealed.

## DISCUSSION

A.    *Standard of Review*

"When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court.  We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*) ["'To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.'"].) "'"Conflicts and even testimony [that] is subject to justifiable

---

[6]    The original information also charged Martin with assault with a deadly weapon (of Brown) (§ 245, subd. (a)), but the count was dismissed.

5

suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.'"'" (*Penunuri*, at p. 142; accord, *People v. Mendez* (2019) 7 Cal.5th 680, 703.)

"'"'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.'"'" (*People v. Vargas, supra*, 9 Cal.5th at p. 820; accord, *People v. Rivera* (2019) 7 Cal.5th 306, 324.) "'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; accord, *Penunuri, supra*, 5 Cal.5th at p. 142 ["'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'"].)

B.   *Substantial Evidence Supports Martin's Conviction of Making a Criminal Threat*
     1.   *Governing law*
To prove the crime of making a criminal threat in violation of section 422, "[t]he prosecution must prove '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the

6

statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.'" (*In re George T.* (2004) 33 Cal.4th 620, 630, quoting § 422, subd. (a); accord, *People v. Roles* (2020) 44 Cal.App.5th 935, 942.)

"Section 422 'was not enacted to punish emotional outbursts, it targets only those who try to instill fear in others. [Citation.]' [Citation.] The statute 'does not punish such things as "mere angry utterances or ranting soliloquies, however violent." [Citation.]' [Citation.] Instead, a criminal threat 'is a specific and narrow class of communication,' and 'the expression of an intent to inflict serious evil upon another person.'" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805 (*Wilson*) [prison inmate's declaration to a corrections officer that he killed officers in the past and would "blast" the corrections officer after he was released on parole in 10 months was sufficient evidence of criminal threat under § 422].) Further, "it is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422." (*People v. Butler* (2000) 85 Cal.App.4th

7

745, 753; accord, *People v. Culbert* (2013) 218 Cal.App.4th 184, 190 (*Culbert*).)

The statutory requirement that a threat be "'unequivocal, unconditional, immediate and specific'" sets forth "the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim." (*People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1158 (*Stanfield*); accord, *Wilson, supra*, 186 Cal.App.4th at p. 807.) Although section 422 requires a threat be "unconditional," the Supreme Court has explained, "'[U]se of the word "unconditional" was not meant to prohibit prosecution of all threats involving an "if" clause, but only to prohibit prosecution based on threats whose conditions precluded them from conveying a gravity of purpose and imminent prospect of execution.'" (*People v. Bolin* (1998) 18 Cal.4th 297, 339 (*Bolin*); accord, *Stanfield*, at p. 1158 ["A seemingly conditional threat contingent on an act highly likely to occur may convey to the victim a gravity of purpose and immediate prospect of execution."].) Further, "'[m]ost threats are conditional; they are designed to accomplish something; the threatener hopes that they will accomplish it, so that he won't have to carry out the threats.'" (*Bolin*, at p. 339; accord, *Wilson*, at p. 806.)

The requirement in section 422, subdivision (a), that the threat cause the victim "reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety" "has a subjective and an objective component. A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances" (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140). Fear is "sustained" within the meaning of section 422 if it lasts for a "'period of time that

8

extends beyond what is momentary, fleeting, or transitory.'" (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349 (*Fierro*) [minute during which the defendant threatened to kill the victim and displayed what appeared to be a gun in his waistband was sufficient to establish victim was in sustained fear]; accord, *Culbert, supra*, 218 Cal.App.4th at pp. 188-190 [substantial evidence supported jury's conclusion defendant's stepson was in sustained fear where for a minute defendant held an unloaded firearm to his head and stated, "'[d]on't ever lie to me'" and "'[d]on't you ever call me that again,'" causing stepson to step back, scream, and "'just about poop[] [his] pants'"]; *People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 [15 minutes was "more than sufficient" to show sustained fear where the defendant was "armed, mobile, and at large" and had threatened to kill the victim and her daughter]; cf. *In re Ricky T.*, at pp. 1135, 1140 [teacher was not in sustained fear where he was not in fear "beyond the moments of the encounter" after student exclaimed "'I'm going to get you'" after teacher inadvertently struck student with a classroom door].)

      2.     *There is substantial evidence Martin's threat conveyed a gravity of purpose and immediate prospect of execution, and placed Solomon in sustained fear*

Martin contends the record does not support his conviction of making a criminal threat because the threat was conditional and not "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." (§ 422.) Martin also contends Solomon was not placed in sustained fear for his safety because Solomon stood up to Martin and then

9

followed Martin back to his seat.  Substantial evidence supports Martin's conviction.

        a.      Martin's threat was grave and immediate

Although Martin's words were conditional in that he threatened, "Get out of my way or I'm going to kill you," his threat as a whole conveyed a gravity of purpose and imminent prospect of execution.  Martin had just been in a violent altercation with Brown and was angry and agitated.  Although Solomon had tried to assist Martin by pulling Brown off him, Martin quickly redirected his anger toward Solomon when Solomon refused to let him pass.  Martin looked Solomon squarely in the eye as he threatened to kill Solomon if he did not get out of the way.  As Martin said these words, he was standing only three and a half feet away from Solomon and holding two knives that looked like "throwing knives" seven to nine inches long, with their tips pointed directly at Solomon.  Believing that Martin "was ready to go ahead and do whatever he wanted to do with the two knives in his hand," Solomon feared he would be stabbed to death if he did not retreat, causing him to step back.  Under these circumstances, Martin's threat conveyed a grave and imminent threat.  (See *People v. Bolin, supra*, 18 Cal.4th at pp. 311, 336, fn. 11, 340 [defendant's threat that if victim touched defendant's daughter again, defendant "would have him 'permanently removed from the face of this Earth'" met statutory definition of criminal threat]; *Stanfield, supra*, 32 Cal.App.4th at pp.1156, 1162 [conditional threat to have lawyer killed if he did not join defendant's political party provided substantial evidence of a gravity of purpose and imminent prospect of execution].)

Martin's reliance on *People v. McMakin* (1857) 8 Cal. 547 is misplaced. There, the defendant intercepted a man riding on horseback along a trail that ran through disputed land, pointed a revolver at the man and threatened to shoot him if he did not leave the land, causing the threatened man to ride off. (*Ibid*.) Affirming the defendant's conviction of assault, the Supreme Court reasoned, "It is true the threat was conditional, but the condition was present, and not future, and the compliance demanded was immediate. Where a party puts in a condition which must be at once performed, and which condition he has no right to impose, and his intent is immediately to enforce performance by violence, and he places himself in a position to do so, and proceeds as far as it is then necessary for him to go in order to carry out his intention," an assault has been committed. (*Id*. at pp. 548-549.) Martin argues that unlike in *McMakin*, he had a lawful right to demand Solomon move to enable Martin to pass in the narrow train car. But Martin offers no authority, nor is there, for the proposition a person in a narrow train car or otherwise can threaten to kill someone who does not allow him to pass.[7]

---

[7]     Martin also argues the lack of a prior relationship between Martin and Solomon militates toward reversal. The parties' prior relationship may be relevant in determining whether a defendant's conduct constitutes a criminal threat. (See *People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 [court properly considered victim's knowledge that defendant had practice of looking inside her home prior to his threat to kill her and her daughter].) But we are aware of no authority holding that threats among strangers are less likely to satisfy section 422. (See, e.g., *Fierro, supra*, 180 Cal.App.4th at p. 1345 [affirming

11

b. Solomon was in sustained fear for his safety

Martin contends there is no substantial evidence his threat placed Solomon in sustained fear because Solomon complied with Martin's demand after only an "instant," and his belief Martin would kill him quickly dissipated. This argument fails because even a short incident in which the defendant threatens to kill the victim can cause the victim to be in sustained fear. (See, e.g., *Culbert, supra*, 218 Cal.App.4th at p. 190 [less than a minute sufficient]; *Fierro, supra*, 180 Cal.App.4th at p. 1349 [one minute sufficient].)

Here, there is substantial evidence Solomon's initial fear of being stabbed persisted for more than the five seconds it took for him to move out of the way. After Martin threatened to kill Solomon while pointing two knives at him, about five seconds later Solomon moved away in an effort to "step out of the situation." Solomon described his fear at that point as significant, causing him to think Martin would stab and kill him, leaving Solomon's wife a widow and his son fatherless. Solomon then walked toward the north end of the train car as Martin followed. It was only after Solomon reached the north end of the train car and saw a number of children in the next train car that he boldly demanded Martin turn around. Although there is no testimony as to how much time elapsed before Solomon

conviction of making criminal threat to kill a stranger and his son after a disagreement over access to pumps at a gas station]; *People v. Ortiz* (2002) 101 Cal.App.4th 410, 413 [affirming conviction of making a criminal threat during carjacking where defendant got into an unknown victim's car at a gas station and told victim he would kill him if he tried "'to do anything'"].)

12

confronted Martin at the north end of the train car, Solomon's testimony makes clear his conduct to that point was motivated by his fear that Martin would make good on his threat to kill Solomon or escalate the violence on the train.

Moreover, the jury reasonably could have concluded Solomon remained in sustained fear of Martin even after Solomon told Martin to turn around and Martin complied. Solomon testified that after Martin returned to his seat at the south end of the train, Solomon waited on the southern stairwell until the train reached the next station so he could watch Martin because he "didn't know if anything would spark as far as [Martin's] attitude, anger, or whatever."[8] The jury could reasonably infer from the fact Solomon placed himself in a position to monitor Martin from a distance sufficient to avoid being stabbed that Solomon remained in sustained fear until Martin disembarked the train and was detained.

Martin argues that Solomon's actions in confronting Martin at the north end of the train car, following Martin back to his seat, and watching over Martin until the train reached Acton showed that Solomon was not in sustained fear of Martin's threats.[9] However, "'[i]f the circumstances reasonably justify the

---

[8]    In his opening brief Martin concedes, "[t]here is no question that Solomon remained wary of [Martin] after hearing the threat or even that, after a period of reflection, the incident took on greater significance," but he argues "Solomon was not afraid [Martin] would actually kill him once [Martin] had turned and walked away."

[9]    Martin also contends that after he returned to his seat, his "demeanor had now changed to one of apparent amusement," which would have allayed Solomon's fear. But Solomon testified

trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Westerfield, supra*, 6 Cal.5th at p. 713.)

## DISPOSITION

The judgment is affirmed.

FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J

---

he did not interpret Martin's laughter to mean Martin's threat was not serious.  Further, some time had already passed since Martin's initial threat by the time Martin returned to his seat.