Filed 9/15/16  P. v. Baek CA2/5
# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>SANG JIN BAEK,<br><br>　　　　Defendant and Appellant. | B264010<br><br>(Los Angeles County<br>Super. Ct. No. SA088822) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Leslie E. Brown, Judge.  Affirmed.

Cynthia L. Barnes, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, and Tannaz Kouhpainezhad, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Sang Jin Baek (defendant) of stalking and criminally threatening his ex-wife Young Ok Baek (Young). We consider whether, under all the circumstances, the threats were sufficient to convey a gravity of purpose and an immediate prospect of execution or were, as defendant contends, merely a misguided attempt to reunify with his wife. We also consider whether the criminal threats and stalking were part of the same course of conduct, requiring sentence on the criminal threat convictions to be stayed.

## I. BACKGROUND

In August 2012, Young filed for a divorce from defendant, her husband of 34 years. She moved into an apartment on Venice Boulevard in Culver City, where she stayed until the divorce was final in May 2013. Defendant was the pastor of a church, but Young believed he was "scamming" people by pretending to be a medical doctor. She tried to stop him without success, and she eventually decided she could not live with the pretense.

Young moved to her own condominium in Culver City following the divorce. Defendant went to Korea, returning to Los Angeles in December 2013.

On December 10, 2013, Young returned home after work and found a note on her door that read, "Don't be surprised. I am inside." Young opened the door, and it was defendant who was inside. He said that he had called a locksmith, who let him into the residence. Young asked defendant to leave but he refused. They argued for about two hours, and Young ultimately agreed defendant could stay overnight. The next morning, defendant again refused to leave. Young tried to call building security, but defendant took her phone. Young then knocked on her neighbor's door, and when she did so, defendant left.

### A.     *January 13, 2014, Letter (Criminal Threat Charged in Count 3)*

About a month after defendant appeared inside her condominium unannounced, Young planned to visit family in Korea. She had a flight booked for January 16, 2014.

2

On January 13, defendant delivered a 52-page letter to the receptionist at Young's workplace, and the receptionist gave the letter to Young. The letter stated defendant had watched Young while she was living in the Venice apartment. Defendant professed not to be afraid of the police, claiming that he could buy them off. Defendant told Young, "You must cut out your physical memory by carving out your genitals with which you have communed with me in the flesh and cutting off your two breasts and live in a state of barrenness." Young understandably found this statement "horrible" and "scary."

Defendant's letter went on to state, "I offer you the last conclusive official notification/alternative plan warning for you to make your final choice." Young testified that there were three choices that defendant wanted her to choose from: (1) prove that the divorce was right by the Bible; (2) reconcile and reunify with him; or (3) continue with the non-biblical divorce. Defendant wrote: "If you say that you cannot do number 1 or 2, enjoying only the things that are to your taste out of all the things that are related to me and then taking all the things that you want to take out of benefit I gave you as you carry out the world's greatest scam because of your extreme selfishness, I will work with a sense of duty to make you realize how wrong such a scam divorce is. If I were to let you live, thinking that perhaps a divorced life is worth living, that is a worse disgrace than divorce itself in front of God." When she read this last sentence (which includes the "[i]f I were to let you live" language), Young believed her life was in danger. She remembered that defendant had told her that if she persisted in the divorce, he would kill her and himself, and she believed that he was referring to this threat in the letter.

Additional statements in defendant's letter suggested—or outright told Young—he would harm or kill her. Defendant wrote, "When you reject 1 and 2, from that moment on, you will grow to curse the fact that you are alive. . . . There is no protection device that will be able to guarantee your safety from the force that will devastate your life." He continued, "If you choose number 3, your life in hell, a life in which you will curse the fact that you are alive will begin. You will be frightened out of your wits" as you go to work, while at work, coming home from work, going to events, entering your house, and while asleep at night. Defendant told Young that if the divorce continued, "I will have to

3

resort to the method God used to deal with Satan. God took all sinners and made them realize that their deaths were due to their own wrongdoing, even if he had to throw them into the second lake of death of fire . . . and you will also end your life in this manner." In particularly vivid language, defendant said, "I will gradually paralyze you until you are contrite about the divorce as you cough up tears of blood." He explained that "in order to do that" he would use "methods that are stronger in degree and even more horrendous than any of the methods I have mentioned in the e-mails I sent you."

Defendant's letter to Young also revealed he had been monitoring her whereabouts. He wrote that "angels" were watching Young, and had told him, for instance, that Young went to a restaurant at Olympic and Crenshaw and met an Asian woman there on January 8. Defendant admitted he went to the restaurant and saw Young with a woman named Lauren. Defendant further described Young's activities on January 9, when Young stayed late at work, and said that an angel had watched Young and reported these activities to him. He added that he could get into her condominium any time he wanted.

On the last page of the letter, defendant told Young that she had three days, or until the morning of the day before she left for Korea, to make her decision. She was scheduled to leave for Korea on January 16, and so understood defendant's deadline to be January 15. Young believed that if she decided not to reconcile with defendant, he was going to kill her.


B.      *January 15, 2014, Email (Criminal Threat Charged in Count 4)*

The day after defendant delivered the 52-page letter to Young at her place of employment, defendant sent her an email attaching a copy of the letter and reminding her that she had until noon on January 15 to make her decision. If she did not choose to reconcile with him, he would "promptly have the angel start carrying out the act." That same evening, she found a note from defendant taped to her front door. The note warned Young that she would not able to sleep in her bed "from tomorrow night."

4

The following day, January 15, 2014, Young again received an email from defendant early in the morning. Among other things, defendant claimed an angel had installed a video device in Young's dining room, and would install the devices throughout the condominium if Young did not reconcile with him. Defendant described additional consequences that would follow absent reconciliation: "I hope that you will live in a state of utmost tension from that moment on. You will never know what may happen when or where. The angel team . . . will scare Young Baek by doing to her the things that will most horrify her." Defendant said that Young would be "lynched" on the way to the airport and, if she managed to make it to the airport, she would be framed as a drug criminal.

Later that evening, while Young was at work, she received a series of three telephone calls which she did not answer. A few minutes after the third call, as Young was standing near a window, she heard a loud noise and saw that the window was broken. Young notified security guard Larry Dunn about the broken window, and Dunn went outside to investigate. When Dunn reached the back of the building to look at the broken window, he saw a white four door vehicle leaving the parking lot. No other cars were moving in the parking lot. Defendant owned a white Hyundai sedan.

Young spent the night at her son's home. On January 16, Young returned home around noon and saw a big hole in her front door. There was a rock on the floor inside the apartment. The hole was covered by a piece of paper signed, "From God's Angel."

C.  *January 16, 18, and 20, 2014, Emails (Criminal Threats Charged in Counts 5 through 7)*

Not only did defendant puncture a hole in her front door on January 16, he also sent Young additional emails that day. In one of the emails, defendant told Young not to ride to the airport with her grandson because the "angel team" wanted to ambush her. Defendant also told her that "[t]he moment you return from Korea a storm that cannot be compared to yesterday and today will be visited upon you. Try persevering through it with your life. The angel team will attack you physically."

5

Young went to the airport with her son; heeding defendant's warning of an ambush by the "angel team," she did not take her grandson with her. There, defendant approached her from behind, tapped her on the shoulder, and surprised her. When Young saw defendant, she realized that he had followed her to the airport. Defendant gave her a ring box, which he said contained a ring for their granddaughter's birthday. Young told him that she did not want the box, but "somehow that box was in [her] hand." She threw the box in the trash because she was worried that defendant had put drugs in the box to frame her, as he had earlier threatened to do. Young went to the security line, and defendant continued to follow her. Young asked a security officer to call the police, and as the officer tried calling, defendant fled.

Two days later on January 18, while Young was in Korea, defendant sent an email to their son Thomas, who was in Korea. Defendant wrote that he had a knife which was not a regular knife. He instructed Thomas to "have a serious discussion with mother" and tell her that if she continued to live as a divorced woman, then her "peaceful life will no longer exist. Even so, if she is to be stubborn to the end, you will get the—get to hear news about your mother and father that will be more terrible than any other news story. . . you have seen on the news during . . . your life." Defendant told his son that he "must make an accurate judgment about what the safest path for your mother will be."

Two days after that, again while Young was still in Korea, defendant sent an another email, this one to Young, their two sons, and their daughter-in-law. Defendant warned: "The conclusion to this fight is one of the two, which is either recovery or the most pitiful end." If Young continued to choose divorce, "[t]here is no one who can protect [her]." Defendant stated that he was "attacking with the determination" and "no official authority and no person will be able to keep Young [ ] safe." Defendant promised that if he returned from his "journey to the netherworld" then Young "will not be able to remain alive in any form from that moment on."

6

D.    *Stalking (Counts 1 and 2)*

On February 5, after Young had returned from her trip to Korea, defendant followed her home from work.  She called the police, and officers arrested defendant at the front door of Young's building.

After defendant's arrest, the Los Angeles District Attorney charged him with five counts of making criminal threats against Young (as already outlined), in violation of Penal Code section 422,[1] and two counts of stalking, in violation of section 646.9.  The information alleged in count 1 that defendant stalked Young between May 7, 2013 (the date of the divorce), and March 18, 2014 (the date of defendant's last communication to Young, namely, a letter he sent from jail after police arrested him for the charged threats).[2]

The prosecutor's theory of the case at trial was that the criminal threats *and* numerous other acts by defendant constituted the stalking.  Indeed, certain of defendant's actions were not charged as, and did not constitute, criminal threats.[3]  Defendant, for instance, harassed Young when he called her repeatedly on January 15, broke a window in her office (at least as the jury could properly infer), and then sent her an email stating that the angels told him what happened at the office.  Defendant also harassed Young when he threw a rock through Young's door at home with a note saying the rock was from "God's Angel."  Defendant also followed Young to the airport, approached her from behind, surprised her, and somehow managed to place a box in her hand; he had previously told her that he would plant drugs on her so that she would be detained by security at the airport.  Defendant's harassing conduct continued when Young returned from Korea: he began calling her within a couple of hours of her arrival in Los Angeles,

---

[1]    Undesignated statutory references that follow are to the Penal Code.

[2]    As we will later explain, the trial court ultimately dismissed the count 2 stalking charge.

[3]    The offense of making criminal threats requires that the threat involve death or great bodily injury.  (§ 422.)

7

and also sending her emails. Two days after Young's return, defendant entered Young's apartment complex and waited outside her door for her.

### E.  *The Defense at Trial*

Defendant took the witness stand in his own defense and testified to the following facts.

For 26 years, defendant had worked as an ordained pastor. Then, in 2011, he discovered he could heal people without medicine. He had a degree in naturopathic medicine, which involves lifestyle changes to improve health. He travelled the world to perform healing.

When defendant returned from Korea in December 2013, he went to Young's condominium because his personal property and car were being stored there. When he got into his car, he opened the glove compartment and discovered a house key inside. He believed that his wife had left the key for him so that he could have access to the condo, so he used the key and went inside. Defendant wanted to live in the condo at least temporarily, and told Young so when she later arrived, but Young wanted him to leave. They had an altercation that night and Young scratched his face in nine places. Defendant had never caused any physical injury to her.

Defendant left the condominium on December 11, as Young wished. They had consensual contact with each other until December 31. From then until January 16, defendant only communicated with Young via email or phone call. On January 16, defendant contacted Young at the airport to give her a ring to take to Korea for their granddaughter's first birthday. Defendant sent emails to Young while she was in Korea because their anniversary was on January 20.

Defendant believed Young had suffered brain damage in a car accident, because her personality changed after that accident. His purpose in writing emails and letters to her was to convince her to return to her old self. He never thought about hurting Young, nor did he ever intend to do so. When he referred to cutting off her genitals, he did not

mean it literally. He only meant that the divorce would cut off her happy memories of their life before the divorce.

### F.    *Convictions and Sentence*

The jury convicted defendant on all five charged counts of making a criminal threat and both charged counts of stalking. The jury found defendant not guilty of attempting to dissuade a witness in violation of section 136.1. The trial court sentenced defendant to the upper term of three years for the count 1 stalking conviction plus five consecutive eight-month terms for the criminal threats convictions, for a total term of six years, four months. The court suspended execution of sentence and placed defendant on formal probation for five years, on the condition, among other things, that he serve 882 days in county jail, which equaled his time served with custody credits. Pursuant to section 1385, the court dismissed the count 2 conviction, stalking in violation of a restraining order, finding the stalking evidence was insufficient because it did not post-date issuance of the restraining order.

## II.  DISCUSSION

Substantial evidence supports defendant's criminal threats convictions. We hold the two elements of a criminal threats offense defendant contends were lacking—specific intent a communication be perceived as a threat and a gravity of purpose suggesting an immediate prospect the threat will be carried out—were amply supported by the evidence. We further hold the trial court did not run afoul of section 654 when it imposed consecutive sentences for the criminal threats convictions. The evidence supports the trial court's implied finding that defendant had multiple independent objectives in making the criminal threats during the time he was also stalking Young.

9

### A. Sufficiency of the Evidence – Criminal Threats

#### 1. Standard of review

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27[ ].) We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 319[ ].) In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' (*People v. Kraft* (2000) 23 Cal.4th 978, 1053[ ].) 'This standard applies whether direct or circumstantial evidence is involved.' (*People v. Catlin* (2001) 26 Cal.4th 81, 139[ ].)" (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

#### 2. Criminal threats

"In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. (See generally *People v. Bolin* (1998) 18 Cal.4th

10

297, 337-340 & fn. 13.)" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228; see also CALCRIM No. 1300.)

The threats should be considered together with the surrounding circumstances to determine the true meaning of the words used. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1433; *People v. Butler* (2000) 85 Cal.App.4th 745, 753.) Although section 422 does not require an intent to carry out the threat, the actions of the defendant after making the threat may help to give meaning to the threat. (*People v. Martinez* (1997) 53 Cal.App.4th 1212, 1220-1221.)

####     3.     *Legal analysis*

There is substantial evidence defendant's threats were so unequivocal, unconditional, immediate, and specific that they conveyed to Young a gravity of purpose and an immediate prospect of execution of the threats, and that defendant intended his statements to be taken as threats.

As we have already detailed, most of defendant's threats were quite specific. In the letter that served as the predicate for the criminal threats charge in count 3, defendant told Young her life would end in a lake of fire and that letting her live would be a greater disgrace than the divorce. He threatened to paralyze her until she coughed up tears of blood. He told her she must carve out her genitals and cut off her breasts, unquestionably acts causing great bodily injury. In the email that served as the predicate for count 4, he coupled his threat of death (that Young would be "lynched") with a specific reference as to when, namely if she went to the airport—which he knew she soon planned to do. In the email that served as the basis for the count 5 conviction, defendant told Young not to drive with their grandson because she was going to be ambushed while driving and physically attacked, and that the attack could cause brain damage to the grandson.

The threats charged in counts 7 and 8 are less specific about the method to cause harm to Young, but still sufficient to convey defendant's threat to kill or gravely injure her. The count 7 email sent to their son stated that defendant had taken out a special knife and warned the son he would hear news about his mother that was more terrible

11

than any news the son had ever heard.  The count 8 email told Young no one could protect her or keep her safe.  Particularly when considered in light of defendant's previous specific threats, which were all close together in time, it was entirely unnecessary for defendant to repeat his vivid threats of torture or death to continue to convey his seriousness of purpose.  (See *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1348 [statement "I will kill you right now" is a criminal threat]; *People v. Butler*, *supra*, 85 Cal.App.4th at p. 752 [a precise manner of execution is not required for a criminal threat].)

In addition, all of the threats indicated that they would be carried out within a very short time frame.  Defendant set and sought to enforce a two-day deadline in connection with the threat charged in count 3, while the count 4 threat told Young harm would befall her at noon the very same day (unless she complied with his demands).  The count 5 threat, sent on the morning Young was scheduled to fly to Korea, was tied to her drive to the airport later in the day.  The count 7 and 8 threats were sent to Young while she was in Korea and concerned her imminent return from Korea to Los Angeles.  These are circumstances sufficient to show the immediacy of the threats.  (*People v. Butler*, *supra*, 85 Cal.App.4th at p. 752 [a precise time is not required for a criminal threat]; see also *People v. Gaut* (2002) 95 Cal.App.4th 1425, 1431-1432 [defendant's threat from jail qualified as criminal threat where victim believed he would be released from prison soon and defendant said he would carry out his threats in a few days].)

Moreover, during the time that defendant was making these threats, he was watching and following Young.  The evidence indicated that he broke a window at her office and made a hole in her door at home by throwing a rock through it.  He followed her to the airport and accosted her although she clearly wanted no contact with him; he desisted and fled only when she sought aid from airport security personnel.  These actions reinforce the gravity of defendant's purpose in making the threats, showing the threats were much more than mere emotional outbursts or expressions of despondency.

To be sure, defendant's threats do use conditional language, that is, he threatens to kill or injure Young if she does not do as he wishes.  Some conditionality is acceptable in

12

a criminal threat. (*People v. Bolin* (1998) 18 Cal.4th 297, 339-340 [reference to "unconditional" does not prohibit prosecution of all threats involving an "if" clause; rather, it only prohibits prosecution where condition precluded threats from conveying a gravity of purpose and imminent prospect of execution]; *People v. Brooks* (1994) 26 Cal.App.4th 142, 144 ["If you go to court and testify, I'll kill you" constitutes criminal threat].) Further, "[l]anguage creating an apparent condition cannot save the threatener from conviction when the condition is illusory, given the reality of the circumstances surrounding the threat." (*People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1158.) Here, Young had previously demonstrated without equivocation that she had no intention of reconciling with defendant. Given this reality, the threats were sufficiently unconditional that Young's fear that defendant would act on his threats was reasonable.

Viewed in light of the surrounding circumstances, the nature of defendant's statements also amply support a reasonable inference that he specifically intended them to be taken as threats. They bear none of the hallmarks of an unthinking, rash outburst nor of an intent to merely jest or engage in empty "tough talk." Defendant made all of his statements in writing, affording him the opportunity to reflect before sending them to his ex-wife. The letter and emails were spaced out over a period of about a week, giving defendant the opportunity to reflect between each one. The terms of defendant's threatening communications themselves, and the circumstances of their delivery, were also demonstrably calculated to instill fear; they were interwoven with details about Young's daily activities, reassurances that defendant or his "angels" had the capability to attack at a moment of his choosing, and the literal breaking of barriers (a window and a door) that would otherwise help keep Young safe. It is more than reasonable to infer from these circumstances that defendant was not merely indulging in angry diatribes, but intended his statements to be taken for what they were: threats. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340 [determination of whether a defendant intended his words to be taken as a threat can be based on all the surrounding circumstances, including defendant's actions after making threats].)

13

*B.*     *Section 654 and Consecutive Sentencing*

Defendant contends sentence on the criminal threat convictions should be stayed pursuant to section 654 because they arose from the same course of conduct as the stalking conviction and were committed with the same objective as that conviction, namely, to force his ex-wife to return to him.

*1.*     *The sentencing hearing*

The prosecutor's sentencing memorandum acknowledged that one of the two stalking convictions should be stayed pursuant to section 654, but made no other argument about whether or how section 654 should apply at sentencing. The prosecutor asserted that defendant was subject to consecutive terms for all five criminal threat convictions, and computed a maximum term of imprisonment of seven years, four months.

Defendant's sentencing memorandum did not refer to section 654, and did not dispute the prosecutor's calculation of defendant's maximum exposure. Defendant focused on his eligibility for probation, and suggested a sentence of five years of formal probation.

At the April 23, 2015, sentencing hearing, the prosecutor and defense counsel argued the appropriate sentence for defendant, and neither side mentioned section 654. As we shall discuss, however, the trial court's comments indicate it impliedly found defendant had multiple objectives in committing his crimes.

*2.*     *Legal analysis*

*a.*     *section 654*

Section 654 prohibits punishment for multiple crimes arising from a single indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1208.) The application of section 654 "turns on the defendant's objective in violating" multiple statutory provisions rather than temporal proximity. (*People v. Britt* (2004) 32 Cal.4th

14

944, 951-952 (*Britt*).) If all of the crimes for which the defendant was convicted were merely incidental to or were the means of accomplishing or facilitating one objective, he may be punished only once. (*Ibid.*) Multiple punishment is proper if the defendant entertained multiple independent criminal objectives. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) As our Supreme Court explained in *Britt*, "cases have sometimes found separate objectives when the objectives were either (1) consecutive even if similar or (2) different even if simultaneous." (*Britt*, *supra*, 32 Cal.4th at p. 952.)

The question of whether Penal Code section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination; its findings will not be reversed on appeal if there is any substantial evidence to support them. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) This review for substantial evidence applies to implied and express findings alike. (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338; *People v. Jones*, *supra*, 103 Cal.App.4th at p. 1143.) "We review the trial court's determination in the light most favorable to the [People] and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones*, *supra*, 103 Cal.App.4th at p. 1143.)

> b. *substantial evidence of stalking independent of the charged criminal threats*

A person commits violates the criminal threat statute when he or she "willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat . . . which . . . causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety." (§ 422, subd. (a).)

The offense of stalking is committed when a person "willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family." (§ 646.9, subd. (a).) "The clear and

15

unambiguous language of section 646.9 defines stalking as a continuous course of conduct crime." (*People v. Chilelli* (2014) 225 Cal.App.4th 581, 586.)

Prior cases have declined to apply the section 654 multiple punishment bar to multiple crimes even though arguably part of a broader course of conduct. (See, e.g., *People v. Perez* (1979) 23 Cal.3d 545, 553-554 [separate punishment permissible for oral copulation and sodomy committed during episode of sexual assault that also included rape]; *People v. Felix* (2001) 92 Cal.App.4th 905, 915-916 [threats separately punishable because multiple crimes are not one transaction where defendant could reflect between offenses and each offense creates a new risk of harm].) The test in any case under section 654 remains whether the defendant harbored a divisible objective as to each of the crimes, and on the facts here, the issue is illuminated by considering whether there is substantial evidence of stalking independent of the charged criminal threats offenses.

Defendant maintains there is no such independent, substantial evidence of stalking and he points to the prosecutor's closing argument, which was partly premised on the assertion that "all of the [criminal] threats comprise the stalking." The prosecutor did not limit the stalking charge to those five threats, however. She also argued that "stalking has to be more than one act. We have so many acts that's not an issue in this case." She pointed to the note defendant left on Young's door, which was not charged as a criminal threat, and argued "the following comprise the stalking. When the defendant left the note on the door and vandalized her window, her door at work, at home, he was stalking her." The prosecutor explained to the jury that a direct threat was not required for the stalking charge, but "can be a threat that is shown by the defendant's behavior."[4] In concluding her discussion of the two stalking charges, the prosecutor noted that although defendant's most severe stalking of Young took place in January, the stalking began after the divorce, when "he contacted her, he called her, he wrote e-mails, she didn't answer."

---

[4] The jury was instructed with CALCRIM No. 1301, which explains that "[a] credible threat . . . may be implied by a pattern of conduct or a combination of statements and conduct."

16

Because stalking is a continuous course of conduct offense, the jury was not required to agree "unanimously that the defendant committed any particular act or acts; it need only agree unanimously that he or she engaged in the prohibited conduct." (*People v. Culuko* (2000) 78 Cal.App.4th 307, 325.) Only one threat is required for stalking, and while the prosecutor did argue the predicate conduct for the criminal threats charges would suffice, substantial evidence independent of those charges could have equally well served as the basis for the jury's finding such a threat had been proven—for instance, the threat via the note left on Young's door or defendant's other conduct, including his acts in following Young, his statement he had cameras in her condo, his statement he could enter her apartment whenever he wished, and his vandalism of her work and home.

With substantial evidence of stalking independent of criminal threats, the trial court was free to determine defendant's intent and objectives in committing the stalking and criminal threats offenses. The trial court impliedly found defendant had multiple criminal objectives in committing those offenses. The court explicitly found that defendant had the intent to psychologically terrorize Young when he made the threats. The court explained: "[Defendant] knew what he was doing. And he used religion and he used all kinds of valid threats of many, many different varieties." In addition, the trial court found that defendant was "manipulative" and so appears to have implicitly adopted the prosecutor's theory of the case as to the purpose of stalking Young, namely, that defendant was obsessed with her and could not accept she was no longer his wife. The two objectives, attempting to keep Young in his life or satisfying his obsession through stalking (entering Young's apartment without permission, putting notes on Young's door, claiming he had cameras in her condo), and instilling psychological terror through criminal threats are sufficiently distinct to support consecutive sentences consistent with section 654.

Because substantial evidence supports the trial court's implied finding that defendant had different objectives for the stalking and the criminal threats, section 654 does not prohibit punishing defendant for both the stalking and the criminal threats. (See *Britt*, *supra*, 32 Cal.4th at pp. 951-952 [application of section 654 "turns on the

17

defendant's objective in violating" multiple statutory provisions rather than temporal proximity].)

DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

TURNER, P.J.

KRIEGLER, J.

18